TIMOTHY WILSON SPENCER

V.

COMMONWEALTH OF VIRGINIA

Record No. 881268

TIMOTHY WILSON SPENCER

V.

COMMONWEALTH OF VIRGINIA

Record No. 881288

September 22, 1989

Present: All the Justices

Carl G. Womack, Jr.; Thomas J. Kelley, Jr., for appellant. (Record Nos. 881268 and 881288.)

Donald R. Curry, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Richard A. Conway, Assistant Attorney General, on brief), for appellee. (Record Nos. 881268 and 881288.)

Justice Stephenson delivered the opinion of the Court.

Timothy Wilson Spencer was indicted for the capital murder of Susan Tucker, i.e., the willful, deliberate, and premeditated murder during the commission of, or subsequent to, rape. Former Code § 18.2-31(e) (1987 Cum. Supp.). Spencer also was indicted for the rape of Tucker.

In a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Spencer of capital murder and fixed his punishment at death. The jury also convicted Spencer of rape and fixed his punishment at life imprisonment. Following a sentencing hearing, the trial court imposed the sentences fixed by the jury and entered judgments on the jury verdicts.

We have consolidated the automatic review of Spencer's death sentence with his appeal of the capital murder conviction, Code §§ 17-110.1(A) and -110.1(F), and have given them priority on our docket, Code § 17-110.2. By order entered November 29, 1988, Spencer's appeal of the rape conviction was certified from the Court of Appeals and consolidated with the capital murder appeal. Code § 17-116.06.

I

Under established principles of appellate review, we will view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commonwealth. On the evening of Tuesday, December 1, 1987, the nude body of Susan Tucker was found lying face down on the bed in the ransacked master bedroom of her Arlington townhouse. A slip-knotted rope was tied around Tucker's neck; the free end of the knotted rope had been used to tie Tucker's hands behind her back. The medical examiner determined the cause of death to be "[s]trangulation by ligature."

Tucker had been dead three to five days before her body was found.

When Tucker's body was discovered, a blue sleeping bag was partially draped over her buttocks, a brown blanket was underneath her, and her nightgown was on the bed. There were large semen stains on all three items. "[P]ubic hairs of Negroid origin" were found on the blanket and in the bathroom sink and on the counter around the sink. Negroid pubic hairs also were found on a washcloth that apparently had been taken from Tucker's bathroom and dropped on a bush a short distance from Tucker's home.

Tucker's murderer had entered the townhouse by breaking a sliding basement window located under the balcony at the rear of the house. Glass samples of the broken window were taken.

On January 20, 1988, Arlington County Police arrested Spencer, a black male, in the City of Richmond on a warrant charging burglary. At the time of his arrest, police seized a camouflage jacket from Spencer. After advising him of his rights, a police officer asked Spencer to voluntarily give blood, hair, and saliva samples. Although the officer told Spencer he was charged with burglary, Spencer asked "if this had anything to do with the rape." When the officer informed him that the crime had occurred in Arlington, Spencer inquired, "Does this have anything to do with the murder then?" Spencer had visited his mother's Arlington home over the Thanksgiving holiday, arriving Thanksgiving morning, November 26, and departing the following Sunday, November 29. Spencer's mother lived approximately seven blocks from Tucker's townhouse.

The medical examiner who performed the autopsy obtained oral, rectal, and vaginal swabs and a blood sample from Tucker's body. The vaginal swab was taken by inserting the swab "as high in the vaginal cavity as it will go;" the swab did not contact the external genitalia. The medical examiner's microscopic examination revealed "four to eight" intact, non-motile sperm in smears made from the vaginal swab. No sperm was observed in the smears made from the anal and oral swabs.

A forensic serologist who subsequently made smears from the swabs taken by the medical examiner found two sperm on the rectal smears but found no sperm on either the vaginal or oral smears. The serologist explained that she had had to rehydrate the dry swabs before testing them. Consequently, the water diluted

any seminal fluid present on the swabs, making the sperm more difficult to detect.

Forensic analysis established that the Negroid pubic hairs found on the washcloth, on the blanket from Tucker's bed, and on the bathroom sink were microscopically consistent "in all identifiable characteristics" with known samples of Spencer's pubic hair. Forensic scientists also determined that glass fragments found in Spencer's camouflage jacket matched the optical properties of Tucker's broken basement window. Only two percent of glass examined at the state laboratory has had the same optical properties.

Analysis of the semen stains found on Tucker's nightgown, the blanket, and the sleeping bag established that the stains were left by a "secretor," *i.e.*, a person whose blood characteristics are expressed in other bodily fluids. Analysis further determined that the individual had blood type O and enzyme groupings of PGM type 1, PGM subtype 1+, and peptidase A type 1. Analysis of Spencer's blood and saliva samples showed that they matched in all respects the secretions found at the crime scene. This particular combination of blood type and enzyme groupings is shared by approximately 13 % of the population.

Spencer's blood sample and the semen collected from the nightgown and the sleeping bag also were subjected to "DNA printing."[1] "DNA" is the abbreviation for deoxyribonucleic acid, which is the chemical that carries an individual's genetic information. The DNA printing technique was used to compare DNA molecules extracted from Spencer's blood with DNA molecules extracted from the semen found at the crime scene. The DNA printing test established that the genetic material in Spencer's blood sample had the same characteristics as the genetic material in the semen stains on the nightgown and the sleeping bag. Such characteristics would be present in one of every 135 million black individuals. There are approximately ten million adult black males in the United States.

## II

Prior to trial, Spencer moved to dismiss the capital murder indictment on the ground that "imposition of the death penalty constitutes cruel and unusual punishment" in violation of Article I,

---

[1] Part VI, *infra*, contains a detailed explanation of the DNA printing procedure.

§ 9 of the Constitution of Virginia and the Eighth Amendment of the Constitution of the United States. The trial court denied the motion, and Spencer has assigned error to the ruling.

In numerous cases, we have held that the death penalty does not constitute cruel and unusual punishment. *See, e.g., Pope v. Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), *cert. denied*, 485 U.S. 1015 (1988); *Gray v. Commonwealth*, 233 Va. 313, 320, 356 S.E.2d 157, 160, *cert. denied*, 484 U.S. 873 (1987); *Beaver v. Commonwealth*, 232 Va. 521, 527, 352 S.E.2d 342, 345-46, *cert. denied*, 483 U.S. 1033 (1987); *Stockton v. Commonwealth*, 227 Va. 124, 134-35, 314 S.E.2d 371, 378, *cert. denied*, 469 U.S. 873 (1984); *Whitley v. Commonwealth*, 223 Va. 66, 77-78, 286 S.E.2d 162, 168-69, *cert. denied*, 459 U.S. 882 (1982); *Bassett v. Commonwealth*, 222 Va. 844, 851, 284 S.E.2d 844, 849 (1981), *cert. denied*, 456 U.S. 938 (1982); *Martin v. Commonwealth*, 221 Va. 436, 439-40, 271 S.E.2d 123, 125-26 (1980); *Clark v. Commonwealth*, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), *cert. denied*, 444 U.S. 1049 (1980); and *M. Smith v. Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979). We adhere to our previous holdings and reject Spencer's contention.

On appeal, Spencer also contends that the death penalty is unconstitutional because a sentencing jury is given excessive discretion and the statutory aggravating factors are "unconstitutionally vague." These constitutional challenges were not raised at trial and, therefore, are barred from appellate review. Rule 5:25; *see Fisher v. Commonwealth*, 236 Va. 403, 410, 374 S.E.2d 46, 50 (1988), *cert. denied*, 490 U.S. ____, 109 S.Ct. 1766 (1989).[2]

## III

The trial court excluded four prospective jurors for cause because they were unwilling to consider imposing the death penalty. Spencer concedes that three of these veniremen stated unequivocally on voir dire that they would not impose the death penalty under any circumstances. Spencer also acknowledges that the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510 (1968),

---

[2] For the same reason, we reject Spencer's contention that the trial court erred in refusing to grant him a new trial because of an alleged violation of the court's witness exclusion order. Spencer failed to make a timely objection that would have afforded the trial court an opportunity to take appropriate corrective measures, if any were required; therefore, we will not consider this contention on appeal. Rule 5:25.

ruled that such an exclusion is proper. He contends, nonetheless, that we have "never addressed whether the exclusion . . . violates a defendant's right to [an impartial jury of his peers]" as guaranteed by Article I, § 8 of the Constitution of Virginia.

In *Townes v. Commonwealth*, 234 Va. 307, 362 S.E.2d 650 (1987), *cert. denied*, 485 U.S. 971 (1988), however, Townes claimed that such an exclusion violated both his Federal and Virginia constitutional guarantees of trial by an impartial jury of one's peers.[3] We rejected Townes' arguments, *id.* at 327, 362 S.E.2d at 661, and, adhering to our previous rulings, *e.g.*, *Pruett v. Commonwealth*, 232 Va. 266, 277-78, 351 S.E.2d 1, 7-8 (1986), *cert. denied*, 482 U.S. 931 (1987), we now reaffirm that the exclusion of such jurors does not violate either the Federal or Virginia Constitutions. *See also Lockhart v. McCree*, 476 U.S. 162 (1986).

Spencer further contends that the trial court erroneously struck venireman Chris Regan because he "had not voiced objections to the imposition of the death penalty which would disqualify him." In a capital case, a venireman properly may be excluded if his views concerning imposition of a death sentence " 'would prevent or substantially impair the performance of his duties . . . in accordance with his instructions and his oath.' " *O'Dell v. Commonwealth*, 234 Va. 672, 695, 364 S.E.2d 491, 504 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)), *cert. denied*, ____ U.S. ____, 109 S.Ct. 186 (1988). Moreover, because a trial judge "sees and hears the juror," *Wainwright v. Witt*, 469 U.S. 412, 426 (1985), an appellate court must accord the trial judge deference in applying the *Adams-O'Dell* standard, *LeVasseur v. Commonwealth*, 225 Va. 564, 584-85, 304 S.E.2d 644, 654-55 (1983), *cert. denied*, 464 U.S. 1063 (1984). The trial judge's decision will not be disturbed on appeal absent a showing of "manifest error." *Bennett v. Commonwealth*, 236 Va. 448, 469, 374 S.E.2d 303, 316 (1988), *cert. denied*, 490 U.S. ____ (1989).

On three separate occasions during jury voir dire, Regan indicated that he could not impose the death penalty. Although Regan stated that he might consider imposing the death penalty "[i]f it was a multiple death involved, . . . like the murder of two or three people," he also clearly stated that "if it's just one

---

[3] See Appellant's Opening Brief in *Townes* (Record Nos. 860793, 860794) at page 42 where this contention is made.

[death], I don't believe in the death penalty." Moreover, when Regan was informed that the present case involved only one murder charge, he unequivocally stated that he could not consider the death penalty. Thus, we conclude that the record supports the trial court's finding that Regan's views about the death penalty would have substantially impaired the performance of his duties as a juror.

## IV

Spencer contends that the evidence is insufficient to prove that he had penetrated the victim's vagina with his penis. Thus, he asserts, the rape conviction cannot stand. Consequently, he concludes, without proof of a rape, there is no capital murder.

■ Our standard for reviewing the sufficiency of the evidence is firmly established.

[W]hen the sufficiency of the evidence is challenged on appeal, the evidence and all reasonable inferences fairly drawn therefrom must be viewed in the light most favorable to the Commonwealth. The trial court's judgment should be affirmed unless it appears that it is plainly wrong or without evidence to support it.

*Tuggle* v. *Commonwealth*, 228 Va. 493, 510, 323 S.E.2d 539, 549 (1984), *vacated and remanded on other grounds*, 471 U.S. 1096 (1985), *aff'd on remand*, 230 Va. 99, 334 S.E.2d 838 (1985), *cert. denied*, 478 U.S. 1010 (1986).

■ Rape is defined as "sexual intercourse with a female by force and against her will." *Id*. To prove that sexual intercourse occurred, the evidence must establish that " 'there has been an actual penetration to some extent of the male sexual organ into the female sexual organ.' " *Id*. (quoting *McCall* v. *Commonwealth*, 192 Va. 422, 426, 65 S.E.2d 540, 542 (1951)).

■ Penetration, like all other elements of the crime of rape, may be proved by circumstantial evidence. *Tuggle*, 228 Va. at 510, 323 S.E.2d at 549. When the Commonwealth relies solely on circumstantial evidence to prove a rape, however, the facts and circumstances must exclude all reasonable hypotheses of innocence. *Id*. at 510-11, 323 S.E.2d at 549-50. Nevertheless, the hypotheses "which must be thus excluded are those which flow from the evidence itself, and not from the imaginations of defense coun-

sel." *Cook v. Commonwealth*, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983).

In the present case, the police discovered Tucker's nude body lying on a bed "face down" with her hands tied behind her back. The medical examiner took a vaginal swab by inserting the swab "as high in the vaginal cavity as it will go" and without allowing the swab to come in contact with the external genitalia. When the medical examiner microscopically examined the smears made from the vaginal swab, she found "four to eight" intact, non-motile sperm. Additionally, the serologist who later examined the swabs found two sperm on the rectal swab. Large semen stains were found on the victim's nightgown, the sleeping bag, and the blanket. Spencer's pubic hairs were found at the scene. Moreover, shortly after the police arrested Spencer and informed him that he was charged with an Arlington burglary, Spencer asked the arresting officer "if this had anything to do with *the rape*." (Emphasis added.) When the officer asked Spencer why he had inquired about a "rape," Spencer responded, "[I]f you want my blood, it must have something to do with *the rape*." (Emphasis added.)

█ In spite of these circumstances, Spencer argues that the evidence does not support the jury's finding that penetration occurred.[4] He primarily focuses upon the fact that the Commonwealth's expert serologist found no evidence of sperm on the vaginal swab. The serologist explained, however, that before she could examine the swab, she had had to apply a "small amount of water" which could have "diluted" any "small amount of seminal fluid [on the swab] . . . to the point where it's no longer detectable."

It was the jury's function to weigh and reconcile the testimonies of the medical examiner and the serologist. If their testimonies conflicted, the jury was empowered to resolve the conflict. Obviously, the jury accepted the medical examiner's testimony concerning the presence of sperm in the victim's vagina, and this alone is sufficient to support the finding that penetration occurred.

---

[4] The jury was instructed that:
Sexual intercourse means an actual penetration, no matter how slight, of the defendant's penis into the sexual organ of the [victim]. It is not necessary that there be an ejaculation by the male.

## V

 Spencer further contends that, assuming arguendo a rape did occur, there is no evidence from which the jury could have concluded that the rape occurred before or at the time of the victim's death. Spencer asserts that "the victim must be alive when the rape occurs. If [the victim] is already dead, there is no Capital Murder." Spencer's contention, however, is directly contrary to our holding in *Coleman v. Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied*, 465 U.S. 1109 (1984).

In *Coleman*, a capital murder case, the defendant challenged the following jury instruction that had been granted by the trial court:

> When the death of the victim occurs in connection with rape, it shall be immaterial in the prosecution thereof whether the alleged rape occurred before or after the death of the victim.

226 Va. at 51, 307 S.E.2d at 875. In his appeal, Coleman argued that the court erred in granting the instruction because "there was no evidence whether the victim was dead before or after the alleged rape." *Id.* Rejecting Coleman's contention, we said:

> [The instruction] was based on Code § 18.2-63.1. The trial court gave it because it was "helpful to the jury." Without the instruction, the jury might have been misled. Instruction IV [a different instruction] only provided as to the capital murder charged in this case that the Commonwealth must prove beyond a reasonable doubt *inter alia* that "the killing was of a person during the commission of rape." *The jury reasonably could have inferred from the evidence that the victim was murdered first and then raped. Without the guidance of [the challenged instruction] the jury might have concluded that Coleman could not be found guilty of capital murder if the rape had been committed after the murder.* The trial court, therefore, did not err in granting [the instruction].

*Id.* (footnote omitted) (emphasis added).

In *Coleman*, we also rejected the defendant's claim that the evidence was insufficient to support a capital murder conviction. In

doing so, we reviewed the evidence and concluded that "[t]he jury reasonably could infer from the evidence that Coleman cut the victim with his knife *and raped her either before or after inflicting the fatal blow*." *Id.* at 52, 307 S.E.2d at 876 (emphasis added).

Spencer, ignoring our holding in *Coleman*, relies upon *Harward v. Commonwealth*, 229 Va. 363, 330 S.E.2d 89 (1985). His reliance is misplaced.

In *Harward*, the sole issue was "whether, under Code § 18.2-31(e), the person murdered can be someone other than the rape victim." *Id.* at 364, 330 S.E.2d at 90. We held that the statute "only proscribes the murder of a rape victim and cannot be extended to include the murder of another." *Id.* at 367, 330 S.E.2d at 91.

Spencer, however, points to our statement in *Harward* that the language "during the commission of, or subsequent to" in Code § 18.2-31(e) "excludes a killing which occurs *before* a rape." *Id.* at 366, 330 S.E.2d at 91 (emphasis in original). This statement was dicta and does not affect our clear holding to the contrary in *Coleman*.[5]

## VI

Next, we determine whether the trial court erred in admitting into evidence the results of the so-called "DNA printing" tests. DNA print identification is based upon several well-accepted scientific principles.

Chromosomes, the genetic seats of the human body, are composed of DNA molecules and protein. The DNA molecule carries the genetic blueprint that establishes each person as separate and distinct. Every cell that has a nucleus[6] contains chromosomes and, ultimately, the DNA molecule. The configuration of DNA molecules does not vary from cell to cell in the same human body; each DNA molecule carries the same genetic code in exactly the same sequence. However, the configuration of the molecule is different in every individual with the exception of identical twins.

---

[5] Effective July 1, 1988, the General Assembly amended Code § 18.2-31(e) to provide that "[t]he willful, deliberate and premeditated killing of *any* person *in* the commission of, or subsequent to, rape" constitutes capital murder. Acts 1988, c. 550 (emphasis added).

[6] Nearly every cell in the human body is nucleated. The only major cell type that has no nucleus is a red blood cell.

As one expert explained, an intact DNA molecule can be compared to a closed zipper.[7] The "teeth" of the DNA "zipper" are composed of the chemical bases adenine, thymine, cytosine, and guanine. In the early 1950's, scientists discovered that these chemical bases, or nucleotides, always pair together in a certain arrangement, *i.e.*, adenine units always pair with thymine units; units of cytosine always pair with units of guanine.

The order in which the nucleotides pair within a DNA molecule governs the genetic code carried by the molecule. In small areas of the DNA molecule, the pairing sequence of the nucleotides is markedly different in every individual except identical twins. These naturally occurring variations are called "polymorphisms." Techniques that enable the polymorphisms in the DNA of one individual to be detected, labeled, and compared with the polymorphisms in the DNA of another individual or in another cell sample from the same individual are the means of genetic identification used in DNA identity testing.

The first step in the testing process is the chemical extraction of the DNA from the biological specimen, *e.g.*, white blood cells, semen, body hair, and tissue. Next, enzymes called "restriction endonucleases" are applied to the DNA molecule to cut the DNA "zipper" into fragments. The enzymes recognize a certain sequence of paired nucleotides, or "teeth," and cut the DNA "zipper" at the point of recognition. The resulting DNA fragments differ in length and number for every individual depending on how often the particular sequence of paired nucleotides recognized by the restriction enzyme appears in the DNA specimen.

Using a technique called "electrophoresis," the DNA fragments are then grouped according to length on a sheet of electrically-charged gel. The electrophoresis procedure arranges the DNA fragments along parallel lines according to the length of the fragments. Once the fragments are arranged by length, a chemical procedure is used to pull apart each fragment of the DNA "zipper" along the "teeth". In other words, the paired chemical bases that form the "teeth" are "unzipped" or unpaired.

The "unzipped" fragments are then transferred from the electrically-charged gel to a nylon membrane. Next, DNA "probes" tagged with radioactivity are applied to the fragments. A DNA

---

[7] In scientific parlance, a DNA molecule is described as a "double-helix" and physically resembles a twisted ladder or a spiral staircase.

"probe" is essentially half a DNA "zipper." The probe seeks out locations on the "unzipped" DNA fragments that have "teeth" that match the composition and sequence of the probe's "teeth." Every probe is designed to search for different polymorphisms at different locations.

To determine the statistical likelihood of random matches, each probe is tested on data bases of DNA samples obtained from a number of unrelated individuals. At the time of trial, the DNA data bases were maintained in three categories: Negro, Caucasian, and Hispanic. From this testing, the frequency with which the probe's matching DNA fragment occurs in a given population is determined. Using population genetics equations standardized in the early 1900's, the individual frequencies are combined to determine the statistical likelihood of the several different DNA fragments appearing in the same sample.[8]

When the radioactive probe finds an exact complementary base sequence, the probe binds to that location, causing radioactivity to accumulate at the bonding site. Any probe that has not bonded to its complementary base sequence is then washed off the nylon membrane. X-ray film exposed to the membrane shows the resulting bands of accumulated radioactivity. The pattern of bands is then compared with the pattern of bands obtained from printing the polymorphisms in the DNA of another individual or in another cell sample from the same individual. In a rape investigation, the DNA pattern of the semen samples collected from the crime scene or from the victim's body is compared with the DNA pattern of the alleged assailant's blood. If the semen sample and blood specimen are from the same person, the probes will bond

---

[8] For example, the three probes used in this case were pAC 255/locus D2S44, pAC 256/locus D17S79, and pAC 225/locus DXYS14. Probe pAC 255/locus D2S44 was tested on a data base comprised of 274 unrelated American blacks. Probe pAC 256/locus D17S79 was tested on 201 unrelated black individuals. The black data base for probe pAC 225/locus DXYS14 consisted of 220 unrelated individuals. These tests showed that the statistical likelihood of each probe's matching DNA fragment appearing in the DNA of unrelated black individuals is 1/657, 1/1292, and 1/159, respectively. The overall likelihood of finding all three fragments in the same sample is determined by multiplying 1/657 x 1/1292 x 1/159, resulting in an overall likelihood of 1/135,000,000.

As one expert explained, the number of individuals in the data base is constantly increasing. Consequently, the statistical likelihood of the probes' matching DNA fragments appearing in a given population will increase from one in 135 million to "some higher number," depending on the number of individuals in the data base.

with DNA segments of identical lengths in identical positions, resulting in two identical patterns of bands.

A sample of Spencer's blood and the semen stains found on the nightgown and the sleeping bag were forwarded to Lifecodes Corporation, a laboratory that performs DNA testing for forensic purposes. Employing this technique, scientists at the laboratory determined that the DNA extracted from the semen stains found on the victim's nightgown and on the sleeping bag matched the DNA extracted from Spencer's blood sample.

The parties stipulated that Spencer does not have an identical twin and that none of his blood relatives had committed the murder. Therefore, the chance that anyone other than Spencer produced the semen stains was one in 135 million. There are approximately 10 million adult black males in the United States.

Dr. Richard Roberts, assistant director of the Cold Spring Harbor Laboratory, Dr. Kenneth Kidd, Professor of Human Genetics at Yale University, and Dr. Michael Baird, Manager of Paternity and Forensic Testing at Lifecodes Corporation, were three of the expert witnesses at trial. The record shows that Dr. Roberts qualified as an expert in the field of molecular biology, and that Dr. Kidd qualified as an expert in the fields of molecular biology and human population genetics. Dr. Baird qualified as an expert in the fields of molecular biology and genetics. These witnesses testified that "DNA printing" is a reliable scientific technique that will not produce a "false positive" result if a sufficient number of probes are used.[9] They also testified that the testing procedure employed in the present case was conducted in a reliable manner. Moreover, the undisputed evidence established that the technique is generally accepted in the scientific community and is used in "[s]everal thousands of laboratories" around the world. Similarly, the undisputed evidence showed that the probes used in this case are reliable and used in "hundreds of laboratories throughout the world."

Indeed, Spencer acknowledges that the evidence establishes that the DNA tests are accepted "as reliable within the scientific community" and that he "was unable to find or produce one qualified expert to debunk either the theory of DNA printing or the statistics generated therefrom." While conceding, therefore, that "the

---

[9] Indeed, Dr. Roberts testified that a carelessly conducted test or the use of severely degraded or damaged DNA would result in a "false negative," i.e., no match at all.

trial court had little choice but to accept the DNA printing evidence," he contends, nonetheless, that we "should hold off until another day any decision that DNA printing is acceptable evidence in the courts of Virginia." We reject this contention.

■ Because the undisputed evidence supports the trial court's conclusion that DNA testing is a reliable scientific technique and that the tests performed in the present case were properly conducted, we hold that the trial court did not err in admitting this evidence.[10]

## VII

Spencer contends that the trial court erred in admitting into evidence a photograph of the victim identified as "Commonwealth's Exhibit 2s." He contends that the photograph "added nothing to [the jury's] consideration" and was so inflammatory "that its admission tended toward a guilty verdict despite the other evidence." We do not agree.

■ We repeatedly have held that the admission of photographs into evidence rests within the sound discretion of the trial court. *Bennett*, 236 Va. at 471, 374 S.E.2d at 317-18; *Gray*, 233 Va. at 342, 356 S.E.2d at 173 (compiling cases). "Photographs of a victim are relevant if they tend to show motive, intent, method, premeditation, malice, or the degree of atrociousness of the crime." *Gray*, 233 Va. at 342-43, 356 S.E.2d at 173. If photographs accurately portray the scene created by an accused, they are not rendered inadmissible merely because they are gruesome or shocking. *Gray*, 233 Va. at 343, 356 S.E.2d at 173.

■ Exhibit 2s was relevant for a number of reasons. It depicted a close-up view of the neck ligature used by the accused. This method tended to prove motive, intent, malice, and premeditation. It demonstrated more graphically than a verbal description the brutality and atrociousness of the crime.

Additionally, the time of the murder was most relevant. The undisputed evidence established that Spencer left Arlington County on the Sunday following Thanksgiving, which was November 29. The victim's body was discovered on Tuesday, Decem-

---

[10] We recently rejected the adoption of the so-called "*Frye* test." *O'Dell*, 234 Va. at 695-96, 364 S.E.2d at 504. To meet the *Frye* test, a trial court must be convinced not only that the evidence is reliable but that it is generally accepted by the scientific community. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Consequently, even if *Frye* were the test in Virginia, DNA printing would meet that test.

ber 1. The medical examiner opined that the victim had died three to five days prior to the discovery of the body. Her opinion was directly related to the discoloration of the victim's skin. Exhibit 2s was the only photograph that showed the extreme discoloration of the victim's face.

Clearly, the photograph was relevant. We hold, therefore, that the trial court did not abuse its discretion in admitting Exhibit 2s into evidence.

## VIII

Code § 17-110.1 mandates that we review the death sentence on the record. In addition to considering the assigned errors in the trial, we must consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Code § 17-110.1(C).

In fixing Spencer's punishment at death, the jury found that both the "future dangerousness" and "vileness" predicates had been proved beyond a reasonable doubt. Spencer contends that "his death sentence cannot stand the scrutiny of these criteria." We do not agree.

On September 4, 1987, Spencer was released from prison to a "half-way" house located in Richmond. As a resident at the "half-way" house, Spencer was still in the custody of the Department of Corrections. Forensic evidence presented during the penalty phase established that within 30 days of his release from prison, Spencer had raped and murdered two women in Richmond. The facts and circumstances of those rape-murders were strikingly similar to those in the present case. Both victims had been strangled to death in a mode similar to the strangulation of Tucker.

Spencer was arrested by Arlington County Police at the "half-way" house in Richmond. When arrested, Spencer was found in possession of a large screwdriver, a knife, and a box of .25 caliber

ammunition. Additionally, Spencer has been convicted of six burglaries, three as a juvenile and three as an adult.

In the penalty phase of the trial, Spencer called seven witnesses, in addition to himself, who gave mitigating testimony. A community center director testified that Spencer "was a loner [who] didn't cause us no problem," and that he had never seen Spencer act aggressively.

A supervisor of the "half-way" house in Richmond stated that Spencer was "[f]riendly, quiet," and did not have a reputation for violence. One of Spencer's junior high school teachers noted that, prior to 1975, when Spencer was his pupil, he had had little self-confidence and was "pretty much alone."

Spencer's mother testified that Spencer had been a "quiet" child, a "good kid." Spencer denied killing Susan Tucker and the two women in Richmond and asked for any sentence except the death penalty.

Unquestionably, the evidence of Spencer's conduct in committing the offense supports the jury's finding of the "vileness" predicate. The victim was naked, and she had been tied in such a position that any struggle by her would have hastened her strangulation. She was then raped, and finally, strangled to death. Evidence of such conduct is sufficient to support a finding of every factor of the vileness predicate. Thus, we hold that Spencer's "conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind [and] aggravated battery to the victim." Code § 19.2-264.4(C).

After considering all aggravating and mitigating factors, we also hold that the evidence supports the jury's finding that, based upon Spencer's past criminal record, prior history, and the circumstances surrounding the commission of the offense charged, there is a probability that Spencer "would commit criminal acts of violence that would constitute a continuing serious threat to society." *Id.* Moreover, we find nothing in the record to suggest that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Pursuant to Code § 17-110.1(E), we have accumulated the records of all capital murder cases reviewed by this court. After considering those records, we conclude that Spencer's sentence of death was not excessive or disproportionate to sentences generally imposed by other sentencing bodies in Virginia for compar-

able or similar crimes. *See, e.g., Hoke* v. *Commonwealth*, 237 Va. 303, 377 S.E.2d 595, *cert. denied*, 491 U.S. 303 (1989) (capital murder in the commission of robbery, abduction, and rape, both future dangerousness and vileness found); *Stout* v. *Commonwealth*, 237 Va. 126, 376 S.E.2d 288, *cert. denied*, 492 U.S. _____, 109 S.Ct. 3263 (1989) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Gray*, 233 Va. 313, 356 S.E.2d 157 (capital murder in the commission of robbery, both future dangerousness and vileness found); *Pruett*, 232 Va. 266, 351 S.E.2d 1 (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Edmonds* v. *Commonwealth*, 229 Va. 303, 329 S.E.2d 807, *cert. denied*, 474 U.S. 975 (1985) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clozza* v. *Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984), *cert. denied*, 469 U.S. 1230 (1985) (capital murder in the commission of rape, both future dangerousness and vileness found); *Coleman*, 226 Va. 31, 307 S.E.2d 864 (capital murder in the commission of rape, both future dangerousness and vileness found); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982) (capital murder in the commission of robbery, both future dangerousness and vileness found); *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980) (capital murder in the commission of rape and robbery, both future dangerousness and vileness found); *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031 (1981) (capital murder in the commission of robbery, both future dangerousness and vileness found); *Mason* v. *Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979) (capital murder in the commission of rape, both future dangerousness and vileness found); *M. Smith*, 219 Va. 455, 248 S.E.2d 135 (capital murder in the commission of rape, both future dangerousness and vileness found).

## IX

We have considered all of Spencer's assignments of error and find no reversible error. We also have made the review of the death sentence mandated by Code § 17-110.1 and conclude that the sentence should be affirmed. Accordingly, the judgments of the trial court will be affirmed.

Record No. 881268—Affirmed.
Record No. 881288—Affirmed.