COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Moon, Judges Benton and Elder
Argued at Richmond, Virginia


TONY BERNARD BROWN
                                        MEMORANDUM OPINION[*] BY
v.        Record No. 0074-94-1          JUDGE LARRY G. ELDER
                                            JUNE 27, 1995
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                     E. Preston Grissom, Judge


          Stephen P. Givando (James T. Wise, on brief),
          for appellant.

          Eugene Murphy, Assistant Attorney General
          (James S. Gilmore, III, Attorney General,
          on brief), for appellee.


     Tony Bernard Brown (appellant) appeals his convictions for

one count of rape in violation of Code § 18.2-61; one count of

abduction in violation of Code § 18.2-47; one count of robbery in

violation of Code § 18.2-58; and one count of assault and battery

in violation of Code § 18.2-51.  On appeal, appellant contends

(1) the trial court erred in limiting his cross-examination of

the Commonwealth's DNA expert, (2) that there was insufficient

evidence to support his convictions because the DNA testing

procedure and evidence obtained therefrom were unreliable, and

(3) the Commonwealth failed to prove a proper chain of custody of

semen and blood samples.  Because we hold that the trial court

_____

     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

committed no error, we affirm appellant's convictions.

On October 4, 1989, Heidi Purdy (the victim) was awakened by an intruder in her Chesapeake house. Although it was dark, the victim could see the intruder's arm and ascertain that he was a black male. The intruder forced the victim to engage in vaginal intercourse, and after unsuccessfully attempting to take the victim's stereo system, he fled. Nineteen months later, appellant was arrested and charged with the rape, abduction, robbery, and assault and battery of the victim. At trial, the victim positively identified appellant as someone with similar characteristics as the man who raped her.

A PERK kit was prepared on the night of the attack, and testimony detailed the kit's chain of custody. Mr. Richard Guerrieri, an expert in DNA analysis who worked for the Tidewater Regional Crime Laboratory, performed DNA analysis on biological specimens taken from the kit. On May 22, 1991, two vials of blood drawn from appellant were also sent to the Tidewater laboratory for the purpose of comparing the blood's DNA with the DNA taken from the underwear worn by the victim on the night of the attack.

During the course of the trial Mr. Guerrieri testified that, based on DNA testing, it was possible to eliminate 99.9999 percent of the black population as the perpetrator; the percentage of the population that could have matched the DNA pattern found by Guerrieri was .00013 percent. The trial court

ruled that Mr. Guerrieri could not be confronted on cross-examination with a scientific report that he did not accept as authoritative in the scientific field. At the court's request, appellant made a proffer as to what the report would have shown. Appellant presented no expert witnesses on his behalf.

On May 5, 1993, at the conclusion of the evidence, the jury found appellant guilty of rape, abduction, robbery, and assault and battery, but not guilty of burglary.

I.

LIMIT ON CROSS-EXAMINATION

First, we hold that the trial court did not err in limiting appellant's ability to cross-examine Mr. Guerrieri, the Commonwealth's DNA expert witness. Appellant attempted to cross-examine Mr. Guerrieri by using the Report of the Committee on DNA Technology in Forensic Science ("the Report"), issued by the National Research Council of the National Academy of Science in April of 1992. However, Mr. Guerrieri refused to recognize the Report as a standard authority within his field of expertise. We are guided by the well-accepted rule, as recently articulated by the Supreme Court of Virginia, that it is improper to allow the "cross-examination of an expert with an article that the expert does not recognize as standard and authoritative in a particular field." Griffett v. Ryan, 247 Va. 465, 473-74, 443 S.E.2d 149, 154 (1994). Therefore, the trial court did not err in deciding that Mr. Guerrieri could not be cross-examined with the use of

the Report.

II.

RELIABILITY OF DNA TESTING PROCEDURE

Appellant contends that the DNA testing procedure and evidence obtained therefrom, and the population statistics used to reach the testing results, are unreliable and insufficient to support a finding that appellant was the perpetrator. As the Supreme Court of Virginia recently stated, "DNA testing is a reliable scientific technique." Satcher v. Commonwealth, 244 Va. 220, 241, 421 S.E.2d 821, 834 (1992), cert. denied, __ U.S. __, 113 S. Ct. 1319 (1993); Spencer v. Commonwealth, 238 Va. 275, 289, 384 S.E.2d 775, 782 (1989), cert. denied, 493 U.S. 1036 (1990). Moreover, in 1990, the reliability of DNA evidence and its admissibility as evidence in the courts of Virginia was codified in Code § 19.2-270.5.

In this case, Mr. Guerrieri, the Commonwealth's DNA expert, detailed the procedures used to test the DNA samples and testified as to the population data bases commonly used by laboratories to reach statistical conclusions about the probability of a DNA "match." While appellant confronted Mr. Guerrieri on cross-examination with matters that may have called into question DNA testing's reliability and validity, "[a]ny controversy over the results of the testing and the statistical calculations goes to the weight of the evidence and is properly left to the trier of fact." State v. Anderson, 881 P.2d 29, 48 (1994).

Mr. Guerrieri testified that he could not eliminate appellant as the source of the semen based on the DNA testing results; the victim testified that she was attacked by a black male (appellant was a black male); and appellant was similar in size to the victim's attacker. Viewing this credible evidence in the light most favorable to the party prevailing below, we hold that the Commonwealth established the intruder's identity beyond a reasonable doubt.

### III.

### CHAIN OF CUSTODY

Lastly, assuming that appellant is not procedurally barred from raising this issue on appeal by Rules 5A:18 or 5A:12, we hold that the Commonwealth sufficiently established a chain of custody for both the semen and blood samples. Appellant presented no evidence that either sample was contaminated or that there was a break in the Commonwealth's chain of custody. The Commonwealth's proof of chain of custody included "a showing with reasonable certainty that the item[s] [were] not altered, substituted or contaminated prior to analysis, in any way that would affect the results of the analysis." Reedy v. Commonwealth, 9 Va. App. 386, 388, 388 S.E.2d 650, 651 (1990) (citation omitted). Keeping in mind that "'[t]he Commonwealth is not required to exclude every conceivable possibility of substitution, alteration, or tampering,'" id. at 392, 388 S.E.2d at 653, we hold that the trial court did not abuse its discretion

in allowing the introduction of the DNA test results.

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed.</u>

BENTON, J., dissenting.

I.

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970). The evidence in this case failed to prove beyond a reasonable doubt that Brown was the perpetrator of the offense.

The Commonwealth's DNA expert, Richard A. Guerrieri, testified as follows:

> Q  Now, it's important in calculating these figures that we understand exactly what they mean.  And by that question what I am saying is you are not by any stretch of the imagination identifying Tony Brown as being the person who deposited that semen inside of [the victim's] underwear?
>
> A  I'm not.  Jurors, this technique is not done to identify an individual as the depositor of the stain.  But rather I'm doing the test to determine if I can eliminate the person that I've been asked to compare.
>
> Q  And not being able to eliminate means that he might be the contributor of the stain?
>
> A  Essentially what it means in the instance we can eliminate a very large percentage of the population that could not have been the depositor.  But, no, we could not eliminate Mr. Brown.

The evidence in this case rises no higher than that testimony.

Based upon a statistical extrapolation, Guerrieri testified that "Brown cannot be eliminated as a possible donor" of the

-8-

material from which he extracted the DNA. Although he testified that statistically he "could eliminate 99.9999 percent of the black population" of the United States as donors of the sample, he also testified that the "[p]ercentage of [the black population] who could have donated the stain with the exclusion of . . . Brown would be approximately .00013 percent." In short, statistically, 130 persons out of each one million persons in the black population of the United States could donate the stain.

Moreover, Guerrieri gave no statistics for the probability of a match within the Hispanic population or any other population group that includes people with dark skins. The victim testified that she could only see her attacker's arm. Based upon seeing his arm, she reported to the police that her attacker was "a black person." Thus, the DNA statistical assumptions are based upon the victim's assumption regarding the attacker.

Furthermore, the statistical evidence did not take into account DNA profiles of persons related to Brown. Guerrieri testified that his statistical "percentage is based on unrelated individuals to Mr. Brown." Thus, his testimony did not exclude persons related to Brown.

"[C]ircumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty." Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977). At best, the Commonwealth's proof relies upon an inference drawn from statistical probability. However,

it is fundamental that "even a probability of guilt . . . is insufficient to support a criminal conviction." Bishop v. Commonwealth, 227 Va. 164, 170, 313 S.E.2d 390, 393 (1984). On its face, the evidence in the record "is insufficient to exclude a reasonable hypothesis that someone other than [Brown] was the criminal agent." Christian v. Commonwealth, 221 Va. 1078, 1083, 277 S.E.2d 205, 208 (1981). The victim's testimony that Brown appeared to be the same height and weight as her attacker did not exclude persons other than Brown. Without some further proof linking Brown to the attack, "the evidence is insufficient to carry the Commonwealth's case from the realm of probability and supposition into the area of proof beyond a reasonable doubt." Hall v. Commonwealth, 225 Va. 533, 537, 303 S.E.2d 903, 905 (1983). For these reasons, I would reverse the conviction.

## II.

The Commonwealth proffered Guerrieri as an expert "DNA examiner." After the trial judge ruled that Guerrieri was qualified as a DNA expert, Guerrieri testified on direct examination concerning the theory of DNA, the characteristics of DNA, the details of DNA analysis, and aspects of population genetics.

Guerrieri also testified on cross-examination that the population data he used to compute the probability of a "match" were derived from a data base collected by the F.B.I. He also acknowledged that the Report of the National Research Council of

the National Academy of Science recommends the use of a statistical approach different than that used by his laboratory.

When the Commonwealth objected to the defense counsel questioning Guerrieri regarding the N.A.S. Report, the trial judge ruled that "[t]he question is whether or not [the N.A.S. Report has] been recognized in the field of forensic science." Guerrieri then responded as follows regarding the N.A.S. Report:

Q  I would ask first of all, are you familiar with the work of the National Research Counsel?

A  Yes.

Q  And the council operating under the name of the National Academy of Science was commissioned back in 1990, I believe, to do a study of the DNA analysis and interpretation of the results, correct?

A  That is correct.

Q  And that resulted in the publication of the study in 1992?

A  Yes.

Q  And contained in that study -- first of all, the members of the National Research Council would have included the people who are experts in the fields of the DNA analysis, molecular biology, population genetics, all of those things?

A  Yes, a variety of fields.

Q  And when they published that study, one of the recommendations contained within it was that a more conservative figure be used in calculating the likelihood of the random match.  And their principle that they endorsed was known as the [ceiling] principle, correct?

A  That was one of their recommendations,

-11-

yes.

                 *    *    *    *    *    *    *

     Q   Is it not true that the National Academy
     of Science may well be the most prestigious
     collection of scientists in this country?

     A   If you're asking in general, yes.  If
     you're asking with applications for forensic
     science to what the work is, then I would
     have a different answer.

     Q   You would give a different answer
     concerning forensic scientists?

     A   My answer would be no.

     Q   Now, is that your opinion or is it an
     opinion that is shared throughout the
     community by other forensic scientists?

     A   It's a universal opinion of forensic
     laboratories.


     In further response to questioning by the trial judge,

Guerrieri testified as follows:

     Q   To clear my mind then, is the work
     recognized as a standard authority in your
     field of forensic science in relation to DNA
     testing?

     A   It's debated.  It's not universally
     accepted, but it's debated.

     Q   Are you saying that it is standard or not
     standard?

     A   No, it's not standard.  It's just argued
     whether it should be accepted as being
     standard.


     The witness was proffered as an expert in DNA and testified

as such.  I believe that the trial judge's ruling denying counsel

the right to question Guerrieri regarding the N.A.S. Report was

based upon the erroneous premise that the N.A.S. Report had to be

standard in the field of forensic science.  Guerrieri was qualified, however, as an expert in DNA.  His testimony was sufficient to establish that the N.A.S. Report was standard in the field of DNA.  Thus, I would hold that the testimony was sufficient to allow counsel to examine Guerrieri concerning the N.A.S. Report.

I dissent.