MICHELLE PHILLIPS, APPELLANT, V.
INDUSTRIAL MACHINE AND NICHOLAS CUSICK, APPELLEES.

597 N.W. 2d 377

Filed July 16, 1999.  No. S-97-1263.

Vincent M. Powers and Elizabeth A. Govaerts, of Vincent M. Powers & Associates, for appellant.

Stephanie Frazier Stacy, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Following a jury verdict in favor of Michelle Phillips, the trial court determined that the testimony of Phillips' expert had been erroneously admitted. Thus, the trial court granted a motion for new trial, and Phillips appeals.

## SCOPE OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an

abuse of that discretion. *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998).

■ A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993).

## FACTS

Phillips sued Industrial Machine and Nicholas Cusick, one of its owners, to recover damages allegedly sustained when a vehicle owned by Industrial Machine and driven by Cusick collided with Phillips' vehicle. Cusick admitted liability, and a jury trial was held to determine the nature and extent of the damages sustained by Phillips as a result of the accident.

Dr. Daniel R. Ripa, an orthopedic surgeon who treated Phillips, testified by videotape deposition that Phillips suffered a posttraumatic cervical strain as a result of the collision. Ripa stated that 3 years after the collision, Phillips continued to suffer from a mild amount of restriction in the extremes of her mobility of the neck. In other words, she still did not have a full range of motion in the neck. Given the fact that after 3 years, there were still objective findings of restricted mobility and subjective complaints of discomfort, Ripa opined to a reasonable degree of medical certainty that Phillips' cervical strain was permanent. However, Ripa stated that he had never been asked to place any restrictions on Phillips' work activities.

Phillips testified that prior to the accident, she had worked at the Lancaster Office of Mental Retardation and at Dillard's department store. After the accident, certain tasks such as lifting or dressing a client at the office of mental retardation made her physically uncomfortable and she became uncomfortable during extended shifts at Dillard's. As a result, Phillips eventually left those jobs and at the time of the trial was operating a day-care business out of her home. Phillips testified that she continued to experience heightened discomfort in her neck and headaches from doing too much housecleaning and other activities.

At the time of the trial, it had been approximately 1 year since Phillips had seen a doctor regarding her injuries. Her hospital and medical bills stemming from the accident totaled $2,236.82. She had not incurred any loss of wages and had no claim for property damage.

Alfred J. Marchisio, Jr., a vocational rehabilitation counselor and consultant, also testified on Phillips' behalf. Outside the presence of the jury, Marchisio stated that Phillips reported to him that she had difficulty with postures of the neck insofar as she experienced increased discomfort when moving the neck repeatedly or quickly and when her neck was tilted forward for any period of time. She also experienced increased discomfort in the neck area when carrying heavy objects. Marchisio stated that personal histories from clients were reasonably relied upon by experts in the vocational rehabilitation field in forming their opinions and that his opinion with respect to Phillips' condition and employability was based on Phillips' medical records and the self-report she provided. In addition, Marchisio explained that he relied upon the "New Work Life Expectancy Tables" published by "Vocational Econometrics," which tables were reasonably relied upon by vocational experts, and upon the definitions for disabilities used within the "State Vocational Rehabilitation Systems" as well as the definition used in the Americans with Disabilities Act. Marchisio said these definitions were reasonably relied upon by experts in the vocational field and that, in essence, they define a disability as "a physical and mental impairment that interferes with a person's ability to do certain functions of their major lifestyles, which include the normal type of things of walking, seeing, hearing, talking, as well as work activities or recreational activities."

A voir dire examination was conducted in which Marchisio stated that he relies upon medical doctors, physical therapists, and input from the client to determine the client's medical restrictions or limitations. Marchisio stated that he has no medical training, that he does not personally diagnose or formulate opinions concerning limitations that should be placed upon a client's work activities, and that he was not aware that any medical doctor had placed a work restriction on Phillips or determined a disability rating. He explained, however, that even without a restriction placed on a client's work activities or a disability rating, he could perform a functional capacity evaluation based upon the information the client gave him, so long as a physician had diagnosed some type of medical condition.

Marchisio stated that a worklife expectancy table is a statistical comparison between the worklife expectancy of a healthy portion of the work force and the "disabled" portion of the work force. Under the tables, the term "disabled" refers to a broad continuum of disabilities spanning from mild or transitory conditions to conditions that result in total dependence on others for care. He admitted that no physician had determined Phillips was disabled as the term is used in the tables.

When direct examination was continued, still outside the presence of the jury, Marchisio stated that his primary conclusion regarding Phillips was that she was not going to be in the work force as long as a healthy person of the same age. He opined that based upon statistical probabilities, the worklife expectancy for a healthy 24-year-old female with the same education as Phillips was to age 54.2, while a disabled 24-year-old female with the same education had a worklife expectancy to age 38.9. He stated that these probabilities were generally relied upon by experts in his field and reiterated that the statistical probability table used did not distinguish between severities of disability. In addition, Marchisio explained that the tables did not distinguish whether the disability had any effect on the ability to work in the person's prior occupation. His opinion as to Phillips' worklife expectancy was based on his understanding that her condition was chronic.

Over defense counsel's objection, the trial court allowed Marchisio to continue his testimony in front of the jury. Marchisio reiterated his testimony concerning Phillips and his reliance upon the New Work Life Expectancy Tables, again explaining that included in the category of disabled persons under the tables were persons with very mild disabilities that did not affect their work, as well as persons with catastrophic disabilities. He opined within a reasonable degree of professional probability that Phillips was not going to stay in the work force as long as another healthy white female her age and that she would exit the job market most likely before the maximum age of a healthy person. Marchisio explained that under table 3 of the New Work Life Expectancy Tables, there was a statistical probability that a disabled person of Phillips' age and education

would have a worklife expectancy to age 38.9, while a healthy person would be expected to work to age 54.2 years. However, due to her positive attitude and motivation, she might be in the work force longer than the statistical average for disabled persons of her age and education.

On cross-examination, Marchisio admitted that no work restrictions had been placed upon Phillips by a physician, that he personally had no medical training, and that he relied upon medical doctors and physical therapists to determine the medical restrictions or limitations that should be placed on a particular individual. Marchisio stated that he was not aware of any physician who had specifically determined Phillips to be disabled as defined by the New Work Life Expectancy Tables, but relied in part upon Ripa's assessment that Phillips' cervical strain injury was a permanent condition. Marchisio was unable to render an opinion as to Phillips' loss of earning capacity given the facts that she was close to completing a bachelor's degree in horticulture and that her previous employment consisted of interim jobs.

The jury was instructed, inter alia, that if it returned a verdict for Phillips, then it must decide how much money would fairly compensate her for her injury. Included among the list of things the jury was instructed to consider was "(3) [t]he reasonable value of the earning capacity the plaintiff is reasonably certain to lose in the future . . . ." The jury returned a verdict in favor of Phillips in the amount of $102,236.82.

In granting Cusick's motion for new trial and ordering that the verdict be vacated, the trial court concluded that Marchisio was not qualified by either knowledge, skill, experience, training, or education to provide what amounted to expert medical testimony that Phillips was disabled as a result of her cervical strain. The court found there was no medical evidence that any doctor or medical professional had placed any restrictions whatsoever on Phillips' work or other activities as a result of her cervical strain and no medical evidence that Phillips' functional capacity was impaired as a result of her injury. The court stated that Marchisio's opinion regarding Phillips' reduced worklife expectancy was premised upon his own factually unsupported and inadmissible conclusion that Phillips was disabled and that the opinion lacked the necessary and proper foundation and for

that reason should have been excluded. In addition, the court concluded that given the broad definition of a disabled person as used in the New Work Life Expectancy Tables and Marchisio's vague conclusion that Phillips would work "less" as a result of her disability, the testimony "was so generic and lacking in certainty that it failed to make the existence of a disputed fact more or less probable, and was of no value to the jury." Given Marchisio's qualifications, the court concluded it was error to permit him to provide what amounted to a medical opinion. The court also concluded that Marchisio acted as a "human conduit" for the admission of inadmissible hearsay and that the instruction on future earning capacity was erroneous because it was predicated on Marchisio's inadmissible, uncertain, and unquantifiable opinion testimony.

## ASSIGNMENTS OF ERROR

In summary, Phillips asserts that the trial court abused its discretion (1) in granting Cusick a new trial, because the court erred in finding that Marchisio's opinion lacked the necessary and proper foundation; (2) in finding that Marchisio's opinion was irrelevant; (3) in finding that Marchisio's testimony was inadmissible hearsay; (4) in finding that the evidence was insufficient to instruct the jury as to the loss of future earning capacity; (5) in granting a new trial without specifically finding that a substantial right of Cusick's had been prejudiced; and (6) in failing to find that the errors, if any, were harmless.

## ANALYSIS

The issue is whether the trial court abused its discretion in ordering a new trial. A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998).

It is well established, however, that where a party has sustained the burden and expense of a trial and has succeeded in securing a verdict on these facts and issues, that the party has the right to keep the benefit of the verdict unless there is prejudicial error in the proceedings by which it was secured. Thus, a motion for new trial is to be granted only when error prejudicial to the

rights of the unsuccessful party has occurred. *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993).

Whether the trial court abused its discretion in granting a new trial depends upon the admissibility of Marchisio's testimony and the effect of such testimony. Expert testimony is permitted pursuant to Neb. Rev. Stat. § 27-702 (Reissue 1995): "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Admissibility of expert testimony is based on four factors: (1) whether the witness is qualified as an expert; (2) whether the testimony is relevant; (3) whether the testimony will assist the trier of fact; and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998). Our review of the trial court's admission or exclusion of expert testimony which is otherwise relevant will be for an abuse of discretion. See *Mahoney v. Nebraska Methodist Hosp.*, 251 Neb. 841, 560 N.W.2d 451 (1997).

One of the bases for granting the new trial was the trial court's conclusion that Marchisio's testimony "was so generic and lacking in certainty that it failed to make the existence of a disputed fact more or less probable, and was of no value to the jury." The court noted that the definition of "disabled" as used in the New Work Life Expectancy Tables made no differentiation between people with minor disabilities and those with serious disabilities or between people with disabilities which affect their work and those with disabilities which have no effect on their work. The court explained that under these broad statistics, Marchisio "could present virtually the same opinion testimony he presented in this case in any courtroom, with any injured plaintiff, without modifying the opinion at all." (Emphasis omitted.) We agree.

Where there is no sound and reasonable basis such that an expert is able to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture, the expert's opinion

is to be stricken. *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998). In *Anderson/ Couvillon*, the plaintiff's economics expert testified as to the plaintiff's loss of future earning capacity based on another expert's opinion that the plaintiff was unlikely to attend college. We held that it was not error for the district court to determine that the testimony was speculative where there was no evidence that the plaintiff, who was 7 years old, would have attended and graduated from college in the absence of the injury. We explained that damages for permanent impairment of future earning capacity may not be based on speculation, probability, or uncertainty, but must be shown by competent evidence that such damages are reasonably certain as the proximate result of the pleaded injury. We determined that the district court did not err in concluding that it was not " 'reasonably certain' " that the plaintiff would have graduated from college absent the injury. *Id.* at 822, 572 N.W.2d at 369.

In *Uryasz v. Archbishop Bergan Mercy Hosp.*, 230 Neb. 323, 431 N.W.2d 617 (1988), the plaintiff's expert projected her future earning capacity to be $215,280. The expert testified that in reaching this conclusion, he assumed the plaintiff was 46 years of age and he considered her past employment history and earnings, which were that she managed a family pharmacy that had never made a profit and that she was employed briefly as a manager at $5.75 per hour. He computed her annual income, using $5.75 per hour as a base, to be $11,960 and multiplied that figure by 18, being her employable years to age 65. No factors regarding the extent or permanency of her impairment were considered or used. Upon cross-examination, the expert stated that if the plaintiff went back to work and she could handle the job, she would have no loss, but if she did not return to work, the figure of $215,280 represented her future earning capacity.

Although the defendant failed to object to the testimony, we concluded that the testimony was subject to objection when adduced and to a later motion to strike for the following reasons: (1) The purpose was to give an opinion on impairment of future earning capacity, which requires the elements of a shown impairment, the extent the earning capacity has been diminished, and the degree of permanency of the impairment to earn-

ing capacity (citing *Lake v. Southwick*, 188 Neb. 533, 198 N.W.2d 319 (1972)); (2) the witness must be shown to possess competent facts and underlying data to give such an opinion, otherwise it should not be received and is subject to being stricken (citing *Clearwater Corp. v. City of Lincoln*, 202 Neb. 796, 277 N.W.2d 236 (1979)); (3) the only evidence in the record of the extent and degree of permanency of the impairment was speculative and indefinite and, at most, presented a fact question for the jury, but in any event, such factors were either not considered or unknown to the witness; and (4) the witness assumed the plaintiff was employable, but his opinion was in terms of total impairment, which was described as not going back to work. We explained that the result of the expert's testimony was that he made a mathematical computation that was within the capabilities of a layperson, which he improperly described as impairment of future earning capacity. This produced speculation and confusion in the evidence.

In *Plattsmouth Pol. Dept. Coll. Barg. Comm. v. City of Plattsmouth*, 205 Neb. 567, 288 N.W.2d 729 (1980), we held that it was error to introduce the testimony of an expert witness who had relied on questionnaires in order to express an opinion as to the salaries of like employees in other cities. We explained that the questionnaires listed minimum and maximum salaries for the position, but there was no indication as to whether the salaries listed were actually being paid or under what conditions employees would be entitled to receive the maximum salaries. We stated that since there was a lack of foundation evidence to establish the source and reliability of the information in the questionnaires and the questionnaires were the basis for the expert testimony, the court should have sustained an objection to that testimony. We explained that an expert witness should not be allowed to express an opinion where the evidence shows there is no adequate basis for the opinion. See, also, *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992) (although results of DNA profile test are generally accepted by scientific communities, probative value must also be considered and whether prejudicial effect exceeds probative value).

In addition, we agree with the trial court's conclusion that Marchisio was not qualified to testify that Phillips was disabled

as a result of her cervical strain simply because Ripa had diagnosed her condition as permanent. The fact that a medical condition is permanent does not equate with a medical opinion that a person is disabled. "Regardless [of] how impressive the background of a witness, his area of expertise should match fairly closely the subject matter of his testimony." Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 7.5 at 721 (1995). Without any evidence that Phillips was in fact disabled, Marchisio's opinion, which relied on the conclusion that Phillips was disabled, lacked foundation and probative value.

In summary, Marchisio concluded that Phillips was disabled because her injury was permanent. Because he concluded that she was disabled, he applied the New Work Life Expectancy Tables, which do not discern between minor and serious disabilities or take into consideration whether such disability affects an individual's ability to work. Marchisio's opinion lacked probative value. For the foregoing reasons, we conclude the trial court did not abuse its discretion when the court determined that it was error to have admitted Marchisio's testimony.

The next question is whether the erroneous admission of this evidence prejudiced Cusick. To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded. *Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 583 N.W.2d 320 (1998). Only an error which is prejudicial to the rights of the unsuccessful party justifies a new trial. *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996). What constitutes unfair prejudice is a matter the Nebraska Evidence Rules entrust to the discretion of the trial judge. *Delicious Foods Co. v. Millard Warehouse*, 244 Neb. 449, 507 N.W.2d 631 (1993).

We cannot say that the trial court abused its discretion in finding the testimony of Marchisio unfairly prejudicial. This testimony was offered to assist the trier of fact to determine a fact in issue. Marchisio testified that there was a statistical probability that a disabled person of Phillips' age and education would work 15.3 years less than a nondisabled person and that it was his opinion that as a result of her injury, Phillips would not be in the work force as long as she would have otherwise. Marchisio's

testimony lacked foundation and unfairly permitted the jury to infer that Phillips should be compensated for this loss of employment. We therefore affirm the order granting a new trial.

AFFIRMED.

GERRARD, J., concurring.

I concur in the majority's determination that the district court's order granting a new trial should be affirmed. I write separately, however, because the time has come to reexamine our analytical framework for the evaluation of expert opinion testimony.

## INTRODUCTION

Judge Learned Hand observed nearly a century ago that "[n]o one will deny that the law should in some way effectively use expert knowledge wherever it will aid in settling disputes. The only question is as to how it can do so best." Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40 (1901). The question posed by Judge Hand has, during the subsequent decades, repeatedly confronted appellate courts in every jurisdiction, including Nebraska.

The most significant recent developments in this area of law have resulted from the decision of the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In that case, the Supreme Court held that the "general acceptance" test for the admissibility of testimony about scientific evidence, as set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), had been superseded by the adoption of the Federal Rules of Evidence. *Daubert, supra.* The Supreme Court rejected the *Frye* test and redefined the standard for the admission of expert testimony in the federal courts. *Id.*

Subsequently, many states with evidentiary rules modeled after the Federal Rules of Evidence began to adopt the *Daubert* standards. See, generally, Heather G. Hamilton, *The Movement from Frye to Daubert: Where do the States Stand?*, 38 Jurimetrics J. 201 (1998). This court, however, has rejected the adoption of *Daubert* and continued to rely on the *Frye* test. See, *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), *over-*

*ruled on other grounds, State v. Freeman,* 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Dean,* 246 Neb. 869, 523 N.W.2d 681 (1994), *cert. denied* 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995), *overruled on other grounds, State v. Burlison,* 255 Neb. 190, 583 N.W.2d 31 (1998).

In light of the subsequent development of the *Daubert* standards and the need to set forth a more comprehensive framework for the evaluation of expert testimony, our decisions in *Carter, supra,* and *Dean, supra,* should be reexamined.

## ANALYSIS

### FRYE AND DAUBERT

This court has described the *Frye* test as setting out a "general acceptance" test for the admissibility of testimony about scientific evidence. *Carter, supra.* Under the *Frye* test, "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014.

Nebraska has relied on the *Frye* test where scientific evidence is concerned. See, e.g., *Carter, supra.* In other areas of expertise, as noted by the majority, we have simply stated that the admissibility of expert testimony is based on (1) whether the witness is qualified as an expert; (2) whether the testimony is relevant; (3) whether the testimony will assist the trier of fact; and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Seeber v. Howlette,* 255 Neb. 561, 586 N.W.2d 445 (1998). Our review of the trial court's admission or exclusion of expert testimony which is otherwise relevant will be for an abuse of discretion. See *Mahoney v. Nebraska Methodist Hosp.,* 251 Neb. 841, 560 N.W.2d 451 (1997). In other words, while we have applied the *Frye* test in attempting to discern the reliability of scientific evidence, we have not required an inquiry into the reliability of testimony relating to other areas of expertise.

The abrogation of the *Frye* test by the Federal Rules of Evidence was recognized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.

Ed. 2d 469 (1993). The *Daubert* Court determined that the "austere" standard of general acceptance, "absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials." 509 U.S. at 589.

Instead, the *Daubert* Court determined that the Federal Rules of Evidence, particularly those rules specifically relating to expert testimony, Fed. R. Evid. 701 through 706, had created a new standard for the admissibility of scientific evidence. It should be noted that the Federal Rules of Evidence relating to expert testimony are essentially identical to their Nebraska counterparts. See, Neb. Evid. R. 701 through 706; Neb. Rev. Stat. §§ 27-701 through 27-706 (Reissue 1995).

Under *Daubert*, when faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert, supra.*

The Court also set out a list of considerations that a trial court may use to evaluate the validity of scientific testimony. *Id.* These include: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) the "general acceptance" of the theory or technique. *Id.* Thus, the Court did not completely sweep away the *Frye* test, but simply determined that it was to be one of a myriad of possible considerations in determining the validity of evidence.

The *Daubert* Court emphasized that this was not to be a definitive checklist, as many other factors could bear on the inquiry into validity in particular cases. The Court stated that the inquiry was to be a "flexible" one, for which the "overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." 509 U.S. at 594-95. "The focus, of course, must be

solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595.

Subsequent Supreme Court decisions have further developed the standards first set forth in *Daubert, supra.* In *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997), the Court determined that in reviewing the evidentiary rulings of a trial court regarding expert opinion testimony, abuse of discretion is the proper standard of appellate review. Compare *Doe v. Gunny's Ltd. Partnership*, 256 Neb. 653, 593 N.W.2d 284 (1999) (admission of evidence reviewed for abuse of discretion where Nebraska Evidence Rules commit evidentiary question to discretion of trial court).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), the Supreme Court determined that *"Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."

It has been written of Fed. R. Evid. 702, which is identical to Neb. Evid. R. 702, that it

> applies to expert testimony involving scientific, technical, and specialized knowledge that might be helpful to a jury. These three categories of knowledge are commonly defined as follows. "Scientific knowledge" refers to the "systematic knowledge of the physical or material world gained through observation and experimentation." "Technical knowledge" refers to practical knowledge or special skills relating to, primarily, the mechanical or industrial arts or the applied sciences. "Specialized knowledge" is a catch-all category that refers to any knowledge focused on a particular field of study, occupation, profession, or experience.

Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post-Daubert World*, 84 Geo. L.J. 1985, 2026 (1996).

The Court made it clear that the *Daubert* standards were to apply not only to "scientific" knowledge but to all types of expert testimony that are admitted pursuant to rule 702. *Kumho Tire Co., supra.* The Court also emphasized that the list of factors for consideration set forth in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), did not necessarily or exclusively apply to all experts or in every case. *Kumho Tire Co., supra.* The Court stated that

> the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.
>
> . . . .
>
> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable. Our opinion in [*General Electric Co. v. Joiner, supra*] makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." [Citation omitted.] That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.

(Emphasis in original.) *Kumho Tire Co.*, 526 U.S. at 152.

In short, under *Daubert, supra*, and *Kumho Tire Co., supra* (*Daubert/Kumho Tire*), analysis, a trial court must, when faced with a proffer of expert testimony, determine if the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid, and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* The conclusions of the trial court will be affirmed absent an abuse of discretion. *Id.*; *Doe v. Gunny's Ltd. Partnership*, 256 Neb. 653, 593 N.W.2d 284 (1999).

CURRENT STATE OF LAW

In *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), this court discussed two reasons for continued adherence to the *Frye*

test: (1) that the *Daubert* standards were relatively undeveloped and uncertain and (2) that *Daubert* might fail to exclude unreliable "junk science." These concerns were, at the time, entirely reasonable. The experience of the intervening years, however, has put those concerns to rest.

Since the U.S. Supreme Court's 1993 decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S..Ct. 2786, 125 L. Ed. 2d 469 (1993), the standards set forth in that opinion have become the majority rule in the United States in analyzing expert opinion testimony. Currently, 27 states have held that the *Daubert* standards are either helpful or controlling in their determinations regarding the admissibility of expert opinion evidence. See, *State v. Coon*, 974 P.2d 386 (Alaska 1999); *Jones v. State*, 314 Ark. 289, 862 S.W.2d 242 (1993); *State v. Porter*, 241 Conn. 57, 698 A.2d 739 (1997), *cert. denied* 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); *Nelson v. State*, 628 A.2d 69 (Del. 1993); *State v. Fukusaku*, 85 Haw. 462, 946 P.2d 32 (1997); *McGrew v. State*, 682 N.E.2d 1289 (Ind. 1997); *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525 (Iowa 1999); *Mitchell v. Com.*, 908 S.W.2d 100 (Ky. 1995), *overruled on other grounds, Fugate v. Com.*, No. 98-SC-313-MR, 1999 WL 401667 (Ky. Aug. 24, 1995); *State v. Foret*, 628 So. 2d 1116 (La. 1993); *State v. MacDonald*, 1998 Me. 212, 718 A.2d 195 (1998); *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342 (1994); *State v. Moore*, 268 Mont. 20, 885 P.2d 457 (1994), *abrogated on other grounds, State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995), and *City of Billings v. Bruce*, 290 Mont. 148, 965 P.2d 866 (1998); *State v. Hungerford*, 142 N.H. 110, 697 A.2d 916 (1997); *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993); *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995); *Breding v. State*, 1998 N.D. 170, 584 N.W.2d 493 (1998) (Meschke, J., concurring specially); *Miller v. Bike Athletic Co.*, 80 Ohio St. 3d 607, 687 N.E.2d 735 (1998); *Taylor v. State*, 889 P.2d 319 (Okla. Crim. App. 1995); *State v. O'Key*, 321 Or. 285, 899 P.2d 663 (1995); *State v. Morel*, 676 A.2d 1347 (R.I. 1996); *State v. Hofer*, 512 N.W.2d 482 (S.D. 1994); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), *cert. denied* 524 U.S. 915, 118 S. Ct. 2296, 141 L. Ed. 2d 157 (1998); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d

549 (Tex. 1995); *State v. Crosby*, 927 P.2d 638 (Utah 1996); *State v. Brooks*, 162 Vt. 26, 643 A.2d 226 (1993); *Wilt v. Buracker*, 191 W. Va. 39, 443 S.E.2d 196 (1993), *cert. denied* 511 U.S. 1129, 114 S. Ct. 2137, 128 L. Ed. 2d 867 (1994); *Springfield v. State*, 860 P.2d 435 (Wyo. 1993).

Eleven states have specifically rejected *Daubert, supra*, in favor of retaining the standards enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See, *Turner v. State*, No. 1952024, 1998 WL 12625 (Ala. Jan. 16, 1998); *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998); *People v. Leahy*, 8 Cal. 4th 587, 34 Cal. Rptr. 2d 663, 882 P.2d 321 (1994); *Flanagan v. State*, 625 So. 2d 827 (Fla. 1993); *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996); *Gleeton v. State*, 716 So. 2d 1083 (Miss. 1998); *Carter, supra*; *State v. Harvey*, 151 N.J. 117, 699 A.2d 596 (1997); *People v. Wesley*, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994); *Com. v. Blasioli*, 552 Pa. 149, 713 A.2d 1117 (1998); *State v. Copeland*, 130 Wash. 2d 244, 922 P.2d 1304 (1996). Five states have rejected *Daubert* in favor of their own unique evidentiary standards. See, *Norfolk Southern Railway Co. v. Baker*, 237 Ga. App. 292, 514 S.E.2d 448 (1999); *State v. Merwin*, 131 Idaho 642, 962 P.2d 1026 (1998); *Dow Chemical Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98 (1998), *rehearing denied* 973 P.2d 842 (1999); *State v. Council*, No. 24932, 1999 WL 184099 (S.C. Apr. 5, 1999); *State v. Peters*, 192 Wis. 2d 674, 534 N.W.2d 867 (Wis. App. 1995), *review denied* 537 N.W.2d 572 (Wis.).

Of the seven states that have not yet decisively addressed the question, one continues to rely on its own unique standard. See *Spencer v. Com.*, 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied* 493 U.S. 1036, 110 S. Ct. 759, 107 L. Ed. 2d 775 (1990). The remaining jurisdictions continue to rely on *Frye, supra*. See, *Brooks v. People*, 975 P.2d 1105 (Colo. 1999); *People v. Miller*, 173 Ill. 2d 167, 670 N.E.2d 721, 219 Ill. Dec. 43 (1996), *cert. denied* 520 U.S. 1157, 117 S. Ct. 1338, 137 L. Ed. 2d 497 (1997); *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998); *People v Peterson*, 450 Mich. 349, 537 N.W.2d 857 (1995); *State v. Klawitter*, 518 N.W.2d 577 (Minn. 1994); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852 (Mo. 1993).

It is evident, then, that in the United States, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), has become the majority rule, and *Frye, supra*, has become an ever-shrinking minority view. Given the number of jurisdictions that have adopted the *Daubert* standards, and the extensive development of the *Daubert/Kumho Tire* standards in the state and federal courts, it can no longer be said that the nature and implications of *Daubert/Kumho Tire* are unknown. Compare *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

In fact, to the extent that this consideration is still relevant, it militates in favor of adopting the *Daubert/Kumho Tire* standards. Nebraska courts risk losing the benefit of helpful and persuasive authority from other jurisdictions on newly presented evidentiary issues by its continued reliance on a test that is increasingly removed from the jurisprudential mainstream.

The concern about "junk science" expressed in *Carter, supra*, now also weighs in favor of adopting the *Daubert/Kumho Tire* standards. The "gatekeeper" function exercised by trial courts under the *Daubert/Kumho Tire* analysis is, in fact, a more effective means of excluding unreliable expert testimony than is the *Frye* test. The experience in jurisdictions which have adopted the *Daubert* standards suggests that the admission of so-called "junk science" evidence is a minimal risk. As the Supreme Court of Alaska has stated:

> We are not convinced that "junk science" is more likely to be admitted under *Daubert* than under *Frye*. Post-*Daubert* reported decisions suggest that courts are acting with restraint, and are giving rigorous consideration to the reliability of scientific evidence. Furthermore, *Frye* also potentially permits admission of unreliable scientific evidence, because a methodology that has been generally accepted might nonetheless have been discredited during a *Daubert* inquiry.

*State v. Coon*, 974 P.2d 386, 397 (Alaska 1999).

Furthermore, there is cause to question one of the assumptions underlying this court's decision in *Carter, supra*: that the *Frye* test provides a more critical assessment of the reliability of

proffered evidence than does the *Daubert* analysis. See *Carter, supra*. As the Supreme Court of Alaska noted:

> *Frye* is potentially capricious because it excludes scientifically reliable evidence which is not yet generally accepted, and admits scientifically unreliable evidence which although generally accepted, cannot meet rigorous scientific scrutiny. Because the *Frye* test potentially excludes evidence that should be admitted under our rules, and also potentially admits evidence that should be excluded under our rules, we conclude that it is both unduly restrictive and unduly permissive.

*Coon*, 974 P.2d at 393-94.

In practice, in other jurisdictions, the *Daubert* standards have proved to be more accepting of newly developed but well-reasoned theories, but more critical of older, more well-established theories that are vulnerable to a searching inquiry. As one writer has noted:

> To say that *Daubert* is less restrictive of expert evidence, to say that it opens the door for the introduction of expert evidence that would not have been admissible under the *Frye* test, is not to say that *Daubert*'s test is an easier test. It may be more lenient in that it allows more — and more novel — science into evidence, but it can be much more difficult in that the *Daubert* test can require a more exacting, expensive, and time consuming foundation.
>
> . . . .
>
> "On the one hand, more science comes in. Science does not have to be generally accepted by other scientists to be admissible in court; the universe of admissible science is expanded by doing away with the general acceptance requirement. On the other hand, less science comes in. The trial judge is to act as gatekeeper and is to scrutinize carefully the proffered scientific evidence and to keep out what is not good science. The universe of science actually admitted may be contracted by the close scrutiny judges are supposed to give this evidence. While it may be that most science generally accepted in the relevant scientific community will be good science, it is not necessarily so."

(Citation omitted.) G. Michael Fenner, *The* Daubert *Handbook: The Case, Its Essential Dilemma, and Its Progeny*, 29 Creighton L. Rev. 939, 953 (1996). See, also, *Williams v. Hedican*, 561 N.W.2d 817 (Iowa 1997).

As Professor Fenner states, the shift from *Frye* to *Daubert/Kumho Tire* allows the admission of more expert testimonial evidence, but specifically forecloses the admission of testimony that is unreliable. Under the *Daubert/Kumho Tire* analysis, the question is not whether the evidence is generally accepted, but whether the evidence is, in fact, reliable. This gatekeeper function, in my opinion, provides a more effective way of ensuring that unreliable testimony is properly excluded from evidence.

The gatekeeper function is particularly important in light of the inordinate weight and deference that jurors are often inclined to afford expert testimony. See, generally, Daniel W. Shuman et al., *Assessing the Believability of Expert Witnesses: Science in the Jurybox*, 37 Jurimetrics J. 23 (1996); Daniel W. Shuman et al., *Juror Assessments of the Believability of Expert Witnesses: A Literature Review*, 36 Jurimetrics J. 371 (1996). The Supreme Court of Connecticut has stated that

> a gatekeeping role for trial judges in relation to scientific evidence is appropriate. Although the extent to which juries give scientific evidence undue deference is uncertain, the potential risk can be greatly reduced simply by allowing the judge, as the participant in the judicial process with both the greater access and ability to gather relevant information, to exclude wholly invalid scientific testimony altogether. Moreover, a trial judge who does admit scientific evidence will be in a better position, by virtue of the knowledge gained during the preliminary assessment, to conduct the trial and instruct the jury in such a way as to minimize the risk that jurors will give that evidence undue deference.

*State v. Porter*, 241 Conn. 57, 73, 698 A.2d 739, 749 (1997).

The court in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), noted that one of the primary objectives of the *Frye* test was to shield jurors from misleading or prejudicial scientific testimony because of the weight and deference generally accorded

by jurors to expert testimony. As the Supreme Court of Connecticut observed, the gatekeeper function of the trial court performing the *Daubert/Kumho Tire* analysis accomplishes this goal more effectively than does the *Frye* test.

Moreover, as the U.S. Supreme Court noted in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), this gatekeeper function for the trial court retains its utility and imperative regardless of whether the testimony at issue is "scientific" or otherwise. The evidentiary rationale that underlies the *Daubert/Kumho Tire* gatekeeping responsibility is not limited to scientific knowledge. As the Court stated,

> it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. . . .
>
> Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony will often rest "upon an experience confessedly foreign in kind to [the jury's] own." *Ibid.* The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

*Kumho Tire Co.,* 119 S. Ct. at 1174-75.

Despite the evident wisdom of applying the trial court's gatekeeper function to all varieties of specialized expert testimony, Nebraska's reliance on the *Frye* test and the limitation of that test to scientific evidence precludes the trial court from acting as

gatekeeper where technical or other specialized knowledge is concerned. Adoption of the *Daubert/Kumho Tire* standards, on the other hand, both encourages the trial court to act as gatekeeper and places that function in the context of a sensible and uniform scheme for the evaluation of all types of expert opinion testimony.

Finally, as was noted in the *Daubert* opinion, Fed. R. Evid. 702, which is identical to § 27-702, does not establish " 'general acceptance' as an absolute prerequisite to admissibility," and "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the [rules of evidence] and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). While the U.S. Supreme Court's interpretation of a federal statute is not binding with reference to a state statute, *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), it is persuasive where the state statute is identical to the federal law at issue. In this instance, I believe that the U.S. Supreme Court was correct in noting the tension between rule 702 and the *Frye* test and that the Court's determination is equally applicable to the corresponding Nebraska statute.

Ultimately, ensuring the relevance and reliability of expert testimony is the intent of an inquiry pursuant to *Daubert/Kumho Tire* or *Frye*, and *Daubert/Kumho Tire* is the better-reasoned and more effective means of accomplishing this end. I believe that we should join the vast majority of jurisdictions in the United States in adopting the standards enunciated in *Daubert/Kumho Tire* as the appropriate criteria for evaluating the admissibility of expert opinion testimony in the courts of Nebraska.

### MARCHISIO'S TESTIMONY UNDER *DAUBERT/KUMHO TIRE*

The parties do not contest that Marchisio was qualified to testify as an expert in vocational rehabilitation. Evidence presented at trial established that Marchisio has a master's degree in guidance and counseling and a bachelor's degree in sociology, and was, at the time of trial, president of Midlands Rehabilitations Consultants, Inc. Marchisio has extensive experience in the field of vocational rehabilitation, was licensed by the Nebraska

Department of Health and Human Services as a certified professional counselor and as a mental health practitioner, and was certified by the Nebraska Workers' Compensation Court as a vocational rehabilitation counselor and job placement specialist.

As the majority notes, the issues presented on appeal relate to the foundation presented for certain opinions to which Marchisio testified. Specifically, the majority addresses two aspects of Marchisio's opinion: (1) his description of Phillips as "disabled" and (2) his determination that Phillips' worklife expectancy had been reduced from 54.2 years to 38.9 years.

I do not agree with the majority's conclusion that Marchisio's opinion lacked foundation because Marchisio was not qualified to determine that Phillips was disabled. The majority assumes that the word "disability" is uniquely associated with a medical diagnosis, such that only a qualified medical expert may use the term. This, in fact, is not the case.

The Supreme Court of South Dakota addressed a similar situation in *Marnette v. Morgan*, 485 N.W.2d 595, 598 (S.D. 1992). The court stated: "We continue to hold that a disability may be established through testimony other than a doctor. There is a distinction between a *disability rating* and an *impairment rating*." (Emphasis in original.) The court articulated that distinction as follows:

> "Although the *medical impairment* rating given by a doctor is an important factor, the extent of *loss of use* does not necessarily equal the extent of medical impairment. . . ."

> . . . .

> "Permanent medical impairment is related directly to the health status of the individual, *whereas disability can be determined only within the context of the personal, social, or occupational demands, or statutory or regulatory requirements* that the individual *is unable to meet as a result of the impairment*."

(Citation omitted.) (Emphasis in original.) *Id.*

In *Marnette*, the court determined that the vocational rehabilitation expert's testimony lacked foundation because there was no medical testimony establishing that the plaintiff suffered any medical impairment. This result was entirely proper, as medical

impairment can be established only through properly qualified medical testimony.

In the present case, however, Ripa testified that Phillips suffered from "restriction in the extremes of her mobility of the neck" such that she did not have full range of motion in her neck. Ripa further testified that it was his opinion, within a reasonable degree of medical probability, that Phillips' injury was permanent. In addition, Phillips herself testified regarding the discomfort and limitations she suffered as a result of the injury. Finally, Marchisio testified that in preparing his opinion, he also relied on his interview of Phillips and an examination of Phillips' medical records.

Based on this evidence, Marchisio could appropriately determine that Phillips was disabled. The testimony of Ripa, Phillips herself, and Phillips' self-report and medical records provided an adequate assessment of Phillips' medical impairment. Given that assessment, Marchisio could conclude that Phillips was disabled, *as that term is used in the field of vocational rehabilitation*, by determining the effect of Phillips' physical impairment in the context of her "personal, social, and occupational demands." See *Marnette, supra.*

I agree, however, with the majority's conclusion regarding Marchisio's opinion that Phillips' worklife had been reduced by the specific figure of 15.3 years. This testimony, when subjected to a *Daubert/Kumho Tire* analysis, lacks the validity required under the Nebraska rules of evidence, and the district court did not abuse its discretion in determining that the erroneous admission of this evidence was prejudicial error requiring a new trial.

Based on the testimony of Phillips and Ripa and Ripa's examination of Phillips and her medical records, as summarized above and in the majority opinion, Marchisio could appropriately offer his opinion regarding Phillips' reduced functional capacity and reduced earning capacity. As a vocational expert, Marchisio would be qualified by education, training, and experience to address how Phillips' physical limitations might affect her employability status.

The specific figure regarding Phillips' reduced worklife expectancy, however, was derived entirely from the "New Work Life Expectancy Tables" published by "Vocational Economet-

rics." Marchisio's reliance on this questionable data is the methodological flaw in his analysis.

The usual foundation for expert reliance on external data, and the guarantee that such data is trustworthy, is generally that it is of the kind that is normally relied upon by experts in the particular field at issue. See § 27-703. Nonetheless, the gatekeeping responsibility of the trial court still requires it to determine whether the basis of an expert's opinion meets minimum standards of reliability before that expert's opinion is admissible. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). If the underlying data are so lacking in reliability that no reasonable expert would rely on them, then an opinion that is derived entirely from them must be excluded from evidence. See *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994), *cert. denied, General Electric Co. et al. v. Ingram et al.*, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995).

> [I]t is the judge who makes the determination of reasonable reliance, and . . . for the judge to make the factual determination under [Fed. R. Evid.] 104(a) that an expert is basing his or her opinion on a type of data *reasonably* relied upon by experts, the judge must conduct an independent evaluation into reasonableness. The judge can of course take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant.

(Emphasis in original.) *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 748.

Marchisio testified that the New Work Life Expectancy Tables were reasonably relied upon by experts in his field. However, Marchisio's opinion about "reasonable" reliance is not determinative. A court must conduct an independent assessment of the data to determine if reliance upon them is indeed reasonable.

Many courts have addressed the reliance of expert witnesses on worklife expectancy tables that are published by the U.S. Department of Labor, Bureau of Labor Statistics, and have

stated that such tables are generally considered to be reliable. See, e.g., *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996); *Mealey v. Slaton Machinery Sales, Inc.*, 508 F.2d 87 (5th Cir. 1975); *Sales v. Republic of Uganda*, 828 F. Supp. 1032 (S.D.N.Y. 1993); *Earl v. Bouchard Transp. Co., Inc.*, 735 F. Supp. 1167 (E.D.N.Y. 1990), *aff'd in part and in part rev'd, and remanded on other grounds*, 917 F.2d 1320 (2d Cir.). But see *In re Air Crash Disaster at Charlotte, N.C.*, 982 F. Supp 1101 (D.S.C. 1997) (U.S. Department of Labor worklife expectancy tables not persuasive because they ignore demographic changes made since 1986).

Even if those courts approving of the U.S. Department of Labor tables were correct, however, their determinations are not persuasive in the present case. The New Work Life Expectancy Tables, used in this case, were not published by the U.S. Department of Labor and contain such broadly defined classifications that reliance on them is not reasonable.

The New Work Life Expectancy Tables represent a statistical model that attempts to compare the worklife expectancy of the healthy segment of the work force with the "disabled" segment. The tables attempt to quantify how long a "disabled" person usually remains in the work force as opposed to a healthy person.

For purposes of the tables, however, the term "disabled" refers to a broad continuum of disabilities, from mild or transitory conditions to conditions that result in total dependence on others for care. In other words, the tables measure and average together the experiences of individuals within a tremendously diverse range of occupations and injuries such that, for statistical purposes, a police officer with a broken arm is equivalent to an attorney who develops a hearing impairment, who is in turn equivalent to a surgeon who becomes a paraplegic.

The flaw in this methodology is apparent. The degree of an individual's unique disability obviously has an effect on how long that individual will remain in the work force. The nature of a person's disability, relative to his or her particular occupation, will also have a commensurate effect on that person's employability status and worklife expectancy. A statistical average of such a broad range of disabilities, applied to an equally broad

range of occupations, renders the result almost meaningless when attempting to determine what effect a disability will have on an individual person under particular circumstances. The use of actuarial tables in determining worklife expectancy should be rejected where the tables do not sufficiently relate to the unique circumstances of the person under evaluation.

In the present case, evidence was presented of facts specific to Phillips, and for Marchisio to render an opinion supported by these facts was not error. Marchisio's opinion specifically quantifying Phillips' reduced worklife expectancy, however, was not based on any facts particular to her but was based solely on data that were too generic to support a reliable opinion.

The use of statistical data by an expert in reaching an opinion is, of course, permissible, but can result in admissible evidence only where the basis for the opinion includes evidence particular to the case, demonstrating the pertinent applicability of the statistical data to the circumstances. That foundation was not present in this case. Marchisio's "reasoning and methodology" were not valid, as the New Work Life Expectancy Tables could not "properly . . . be applied to the facts in issue." See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Consequently, it was error to admit Marchisio's opinion that Phillips' worklife expectancy had been reduced by 15.3 years. The *Daubert/Kumho Tire* requirement that an expert's conclusions be supported by good grounds for each step in the analysis means that any step that renders the analysis unreliable under the *Daubert/Kumho Tire* factors renders the expert's testimony inadmissible. See *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994).

Given our standard of review, I cannot say that the district court abused its discretion in determining that the admission of Marchisio's testimony was error, or in determining that the error was prejudicial and required a new trial. It is for these reasons that I concur in the judgment.

HENDRY, C.J., and MILLER-LERMAN, J., join in this concurrence.