COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Bumgardner
Argued at Alexandria, Virginia


WILLIAM RICHARD HASSON, III

v.        Record No. 0403-05-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JAMES W. HALEY, JR.
MAY 23, 2006


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Rossie D. Alston, Jr., Judge

(Charles C. Maddox; Maddox, Hoppe & Hoofnagle, L.L.C., on
brief), for appellant.  Appellant submitting on brief.

Stephen R. McCullough, Assistant Attorney General (Judith
Williams Jagdmann, Attorney General, on brief), for appellee.


Convicted by jury of multiple offenses, William Richard Hasson, III asserts the trial court

erred in the following:  1) admitting testimony concerning the content of a court order in violation

of the best evidence rule; 2) admitting evidence of prior or contemporaneous unadjudicated bad acts

committed by appellant; and 3) admitting fingerprints made reproducible from a sticky surface,

alleging the method employed was scientifically untested and unreliable.  We affirm.

I.

Initially, we note:

> The jury's verdict will not be disturbed on appeal unless plainly
> wrong or without evidence to support it.  Upon familiar principles,
> we view the evidence in the light most favorable to the
> Commonwealth, granting to it all reasonable inferences fairly
> deducible therefrom.

Ragland v. Commonwealth, 16 Va. App. 913, 915, 434 S.E.2d 675, 676-77 (1993).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

As the parties are conversant with the facts in this matter, we recite only those relevant to the evidentiary issues presented on appeal.

Appellant moved in with his godmother, Edna Hubbard, around September 2001. Shortly thereafter, Hubbard was diagnosed with Alzheimer's disease. In November 2001, the Superior Court of Washington D.C. appointed Clarissa Thomas as Hubbard's guardian *ad litem*. Thomas recognized several questionable financial transactions in Hubbard's accounts and had an order freezing her accounts entered on November 1, 2001. In compliance with that order, appellant surrendered two credit cards to Thomas.

Thomas later learned that appellant had other credit cards in Hubbard's name. The Superior Court entered two orders, one on May 14, 2002 and another on May 21st, which directed appellant to stop using these cards. The May 14 order also required appellant "to cease from obtaining credit cards in her name and turn over her vehicle and to remove his name from her deed in her annuity." Thomas's responsibilities ceased upon Hubbard's death on June 15, 2003.

In July 2003, the parts manager at Hendrick Jeep in Woodbridge received a telephone call and an order for parts for a 2004 Jeep Grand Cherokee. The caller supplied an American Express card and the name Hubbard for the order. On July 17th, appellant went to the dealership and signed the name "Edna Hubbard" on two tickets, one for $245 and one for $89.87. According to the cashier, appellant presented "the credit card number written on a piece of paper and said it was his mother's, that she had given him permission to use it."

On July 23, 2003, an associate at the Circuit City store in Manassas met with "a gentleman [who] came in and wanted to get a system in his truck." The "gentleman," identified at trial as appellant, said he had to leave for an appointment. Appellant later called the store,

spoke to the associate, and asked to place the order over the phone. Appellant placed an order for "two head rest monitors, DVD player, satellite radio, subwoofers, [and] new speakers." He placed the order under the name "Edna Hubbard" and provided a credit card number to the associate over the phone. The associate informed him that he would have to bring the credit card in for verification.

Appellant thereafter dropped off a Jeep Grand Cherokee with Illinois tags, and Circuit City installed the ordered equipment into the vehicle. Appellant returned to pick up the vehicle, supplied a credit card to the associate, and signed the receipts "Edna Hubbard." The associate recognized a Discover card presented at trial as the card appellant presented and testified, "The card says Edna Hubbard on it. That all matched up, but it didn't help that a different credit card number [] was taped onto the card." The associate continued, "Well [appellant] had said that it was his mother's card and she couldn't come in for some odd reason. I think he also gave some other reason as to why he had the card, that it was his mother's business and he was entitled to use it." The two orders were in the amount of $2,367.47 and $435.66.

Upon presentation of the Discover card, the associate sought the advice of his manager. This manager spoke to the store manager and attempted to arrange for another form of payment, since "the embossed number on the charge card wasn't the number [appellant] gave us." Appellant then attempted to pay by check; the check was declined. Appellant informed the manager that "he was going to come back the next day with the card that would have the number embossed on it so we could imprint that and get a signature on that card." After appellant left the store, the manager called the credit card company "to see if it was a legitimate transaction." As a result of the conversation with Discover, the store manager called the Prince William County police.

On Monday July 28th, appellant returned to the store. As soon as he entered the store, the store director telephoned the police. Appellant asked for the manager and informed him he wanted to pay cash for the orders. While the manager was speaking with appellant, police arrived and began to speak with appellant.

Detective Joanie Jaeger responded to the situation, explained to the appellant "the issue [] at hand," and asked if police could call Ms. Hubbard to verify that he was an authorized user on the account. Appellant responded "that it was his mother's account . . . and [] said she had just flown out to Chicago that morning." Thereafter, police seized both the 2004 Jeep Grand Cherokee and a purple TransAm which appellant had arrived in earlier. In the TransAm, police saw in plain view, "a credit card on the floor that looked like it had pieces of white paper taped on the front of it in a similar fashion to one that had been taken from Mr. Hasson earlier in the day." Later, and pursuant to a search warrant, police found a copy of Edna Hubbard's will, six credit cards - two of which were in Hubbard's name - with "a little small white strip of paper with a series of numbers on them . . . highlighted in yellow," a SunTrust checkbook in Hasson's name, a check from that account made out to Circuit City in the amount of $2,803.43, and an Illinois driver's license in Hasson's name.

Police impounded the 2004 Jeep Grand Cherokee. Thereafter, Detective Jaeger "collected the VIN plate which had been attached on top of another VIN plate with some sort of adhesive." The old VIN number matched the Certificate of Origin from a Jeep Grand Cherokee that had been reported stolen from Waldorf Chrysler Jeep in Maryland. Steven Clauser appeared at trial and testified that the VIN plate found on top of the old one matched a VIN plate missing from his 2003 black Jeep Grand Cherokee.

At trial and during the testimony of Clarissa Thomas, Edna Hubbard's guardian *ad litem*, appellant objected to testimony concerning the orders entered by the Superior Court of

Washington D.C.. Specifically, appellant objected to Thomas's testimony about the May 14th and 21st orders. Appellant's counsel stated, "I guess my objection is that this is like a best evidence thing if the document is available and present, rather than having her testify to the recollection of it." The trial court overruled the objection. When asked if she had a copy of the order(s) with her, Thomas responded, "I have a copy of it in my bag." The trial court permitted defense counsel to "peruse the May 14th order."

Appellant also objected to the introduction of evidence found in the purple TransAm, specifically three credit cards with Hasson's name imprinted, the SunTrust checkbook, and the check written to Circuit City. Appellant argued, "I think the prejudicial aspect of just introducing them in as well . . . if [the Commonwealth] is not going to argue that there's some kind of common scheme or modality to this thing, then they're irrelevant." The trial court overruled the objection.

Finally, appellant objected to the method the police employed to lift fingerprints from the VIN plate removed from the Jeep Grand Cherokee. Crime scene analyst Kenneth Warner testified that he used a process developed by a colleague in order to obtain prints from the adhesive on the back of the VIN plate. Warner explained "the prints can't be recovered through use of clear tape and applying that to a white card, which is most commonly done." Warner further testified that he used

> a mixture with equal parts of water, black fingerprint powder and clear Ivory dish soap that's mixed together, applied to the adhesive strip and let sit for about thirty seconds or so and then rinse it off. And what is left behind, in this case, was a developed set of fingerprints, a ridge detail.

Warner testified that he then took photographs to record the result.

In response, appellant's counsel asserted, "I think that this has not been established as a valid process for collecting fingerprints at this point anyway." The trial court recognized the

process as a "new technique" and found "the evidence is admissible for the purpose as suggested." Shortly thereafter, Officer Leonard Holipski, a fingerprint expert with over 40 years of experience in that field, testified that the prints taken from the adhesive matched the fingerprints taken from appellant after his arrest.

The jury convicted appellant on all counts, and he was sentenced to 24 years of incarceration, with 17 of those years suspended. Appellant thereafter appealed to this Court.

### III.

### A.

### BEST EVIDENCE RULE

"In Virginia, the best evidence rule provides that 'where the contents of a writing are desired to be proved, the writing [the primary evidence] itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted.'" Bradshaw v. Commonwealth, 16 Va. App. 374, 379, 429 S.E.2d 881, 885 (1993) (quoting Randolph v. Commonwealth, 145 Va. 883, 889, 134 S.E. 544, 546 (1926); Butts v. Commonwealth, 145 Va. 800, 816, 133 S.E. 764, 769 (1926)). "The best evidence rule . . . requires that the original of the document be produced only where the contents of the document *per se* are to be proved." Myrick v. Commonwealth, 13 Va. App. 333, 339, 412 S.E.2d 176, 179 (1991). See also Carmody v. F.W. Woolworth Co., 234 Va. 198, 200, 361 S.E.2d 128, 129 (1987) ("While this Court has long required proof of a case through the most reliable evidence available, [plaintiff] has not challenged the *content* of the license agreement . . . ." (emphasis in original) (citations omitted)).

Here, the wording and content of the orders are not directly in issue.[1]  The actual content - i.e., the "precise wording" - of the orders was not in dispute.  In fact, defense counsel, during his cross-examination of Thomas, viewed the May 14th order and did not dispute its contents or effect.  Also, on brief, appellant admits that the orders are "at best only tangentially related to the charges for which the Appellant was on trial."  As such, court orders that are "at best only tangentially related" cannot also be "directly in issue" in the case.  Accordingly, the best evidence rule does not apply.

B.

PRIOR OR CONTEMPORANEOUS UNADJUDICATED BAD ACTS

On brief, appellant argues the trial court "abuse[d] its discretion by permitting the submission of evidence of prior or contemporaneous unadjudicated bad acts unrelated to the charges in the case at bar."  At trial, counsel specifically objected to three other credit cards (each imprinted with Hasson's name), the checkbook in Hasson's name, and the check from that account made out to Circuit City.  The trial court allowed Jaeger to testify "that in the car these cards were found" but did not, however, allow her "to testify as to these credit[] [cards] belonging to anybody else because [the Commonwealth] can't make the link between these people who you believe these cards belong to and the card itself."

Thus, this evidence, as offered, did not tend to prove any prior or contemporaneous unadjudicated bad act.  In fact, these items were in appellant's name, not someone else's, and the Commonwealth did not plan to introduce evidence to the contrary.  The seized items did have probative value, however, because they linked appellant to the automobile driven to Circuit City.  Thus, these items were only "a factual circumstance" of the search, as they were merely found

---

[1] We note that Thomas's duties as guardian *ad litem* ceased upon Hubbard's death.  Thus, any order(s) affecting Thomas's duties as guardian no longer had any effect.

- 7 -

alongside the other items in the TransAm. <u>Thomas v. Commonwealth</u>, 44 Va. App. 741, 757, 607 S.E.2d 738, 745 (2005). Accordingly, appellant's argument on this point lacks merit.

C.

FINGERPRINT ANALYSIS

Initially, with respect to fingerprint evidence, we note, "'[t]he accuracy of fingerprint identification is a matter of common knowledge and no case has been cited, and we have found none, where identification so established has been rejected.'" <u>Avent v. Commonwealth</u>, 209 Va. 474, 478, 164 S.E.2d 655, 658 (1968) (quoting <u>Stevenson v. United States</u>, 380 F.2d 590, 592 (D.C. Cir. 1967)).

Appellant asserts that the trial court abused its discretion "in taking testimony from an unqualified expert regarding a novel scientific method of obtaining evidence." In essence, appellant's argument is two-fold: 1) that Officer Warner was "an unqualified expert"; and 2) that the procedure used to lift the fingerprints was new and thus unreliable.[2]

As to the argument that Officer Warner was "an unqualified expert," appellant never challenged Warner's qualifications at trial. Appellant only objected to the method Warner employed to lift the fingerprints. Accordingly, we do not address appellant's first point, as it was not presented to the trial court. Rule 5A:18.

With the respect to appellant's second point, we recognize,

> When scientific evidence is offered, the court must make a
> threshold finding of fact with respect to the reliability of the
> scientific method offered, *unless it is of a kind so familiar and
> accepted as to require no foundation to establish the fundamental
> reliability of the system, such as fingerprint analysis . . . .*

---

[2] On brief, appellant also suggests that Officer Warner's testimony concerning the new method "is on one hand hearsay, and on the other, lacking the best evidence as argued supra, in the first question presented in this brief." Appellant did not present either of these objections to the trial court, and accordingly, we will not address them for the first time on appeal. Rule 5A:18.

Spencer v. Commonwealth (Spencer II), 240 Va. 78, 97, 393 S.E.2d 609, 621 (1990) (citing

Avent, 209 Va. at 478, 164 S.E.2d at 658) (emphasis added).[3]  Moreover,

> Wide discretion must be vested in the trial court to determine,
> when unfamiliar scientific evidence is offered, whether the
> evidence is so inherently unreliable that a lay jury must be shielded
> from it, or whether it is of such character that the jury may safely
> be left to determine credibility for itself.

Id. at 98, 393 S.E.2d at 621.

In People v. Webb, 862 P.2d 779, 798 (Cal. 1993), the California Supreme Court

addressed an objection to a method which obtained fingerprints from duct tape by, "in an

enclosed tank, expos[ing] it to heat, superglue and dye, and then view[ing] and photograph[ing]

the item through an orange filter with the aid of a laser beam."  There, the defendant maintained

the prosecution had not demonstrated this method of reproducing fingerprints had been accepted

by the scientific community or by other courts.  That court held:

> The reliability of the laser procedure in producing an image
> commonly recognizable only as a human fingerprint was manifest
> at trial.  The photographic result of [the analyst's] method was seen
> by the jury, and there was no dispute that the method produced this
> result without tampering or alteration of any kind.  Since the laser
> process produced a directly recognizable image of defendant's
> fingerprint, it is unreasonable for defendant to suggest that the
> process might somehow have captured a fingerprint which did not
> exist, transformed some other image into a fingerprint, or changed
> the fingerprint of another person into one which matched
> defendant's.
>
> Where, as here, a procedure isolates physical evidence whose
> existence, appearance, nature, and meaning are obvious to the
> senses of a layperson, the reliability of the process in producing

---

[3] The Virginia Supreme Court has not yet determined whether Virginia courts should employ the test for scientific evidence articulated by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See John v. Im, 263 Va. 315, 316, 559 S.E.2d 694, 697-98 (2002).

that result is equally apparent and need not be debated under the standards [of admitting new scientific methods].

Id.

As applied to the instant facts, we find the dissent's interpretation of Spencer II unpersuasive. In that case, the Court addressed whether the evidence supported the conclusion that DNA testing itself, then a novel scientific technique, was a reliable scientific method. And, as quoted above, such evidence is necessary *unless* the method "is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis . . . ." Spencer II, 240 Va. at 97, 393 S.E.2d at 621 (citation omitted).

The dissent fails to recognize the distinction between a scientific technique, such as fingerprint (or DNA) analysis, and a method of collecting the material to be analyzed. Moreover, here the accuracy and reliability of the method of collecting and recording the latent fingerprints is in essence self-proving; that is, the collected and recorded fingerprints match those of appellant's on record. And, as the California Supreme Court opined, "it is unreasonable for defendant to suggest that the process might somehow have captured a fingerprint which did not exist, transformed some other image into a fingerprint, or changed the fingerprint of another person into one which matched defendant's." Webb, 862 P.2d at 798. For example, the use of a digital camera, as opposed to a traditional one, is not a novel scientific method. Rather, it is merely a new way of photographing an image.

Here, the trial court, in overruling the objection and leaving the question of credibility for the jury, found this method "of such character that the jury may safely be left to determine credibility for itself." Spencer II, 240 Va. at 98, 393 S.E.2d at 621. Accordingly, we hold the trial court did not abuse its discretion in admitting the fingerprint evidence and properly left the question of weight for the jury.

IV.

In light of the foregoing, appellant's convictions are affirmed.

<u>Affirmed.</u>

Benton, J., concurring, in part, and dissenting, in part.

I concur in the holding the trial judge did not err in allowing limited testimony about the altered credit cards, the checkbook, and check written to Circuit City found in William Hasson's car. I dissent, however, from other parts of the opinion. I would hold that the trial judge erred in overruling Hasson's best evidence objection to testimony about the contents of the protective order, but I would hold that the error was harmless. I would also hold that the trial judge erred in allowing testimony about the novel fingerprint retrieval method employed by the police officer in this case.

I.

We have explained the best evidence rule as follows:

> In Virginia, the best evidence rule provides that "where the contents of a writing are desired to be proved, the writing [the primary evidence] itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." Randolph v. Commonwealth, 145 Va. 883, 889, 134 S.E. 544, 546 (1926); Butts v. Commonwealth, 145 Va. 800, 816, 133 S.E. 764, 769 (1926). Thus, if the purpose is to prove the truth of the contents of a writing, the primary evidence must be produced, if available. It is only when sufficient evidence discloses that the primary evidence is not available that secondary evidence may be admitted for that purpose. Id.

Bradshaw v. Commonwealth, 16 Va. App. 374, 379, 429 S.E.2d 881, 884 (1993).

At trial, the prosecutor sought to prove the existence of a protective order barring Hasson's use of Edna Hubbard's credit card. Hubbard's former guardian *ad litem* testified as follows:

> Q: Was there some time when a protective order was awarded regarding Mr. Hasson's control or use of Ms. Edna Hubbard's accounts or property?
>
> A: Yes. Once I learned about the additional credit cards, I filed a motion asking the Court to ask them to turn over the credit cards or stop using the credit cards.

- 12 -

And I believe on May the 14th of 2002 and May the 21st of 2002, the Court issued an order indicating that the credit cards or any use of the credit cards by Mr. Hasson would cease, and any personal property of Ms. Hubbard's would remain in the house.

I'm trying to think of what else. And I believe there was also an issue of whether --

The trial judge overruled Hasson's objection that the best evidence rule required the order's contents to be proved by the document. The witness then continued to testify about the order's contents.

Q: And what was the limitation of what he was -- or the order of the Court regarding his use of those certain credit cards and property?

A: Basically that he should turn over anything pertaining to the First Union bank account to me and that the tags and the vehicle that was owned by Ms. Hubbard should be also transferred to the Department of Motor Vehicles.

Then he was to return any personal property to Ms. Hubbard's residence. . . .

Q: Was there also a later order in November of 2001?

A: I'm sorry?

Q: There was a request on November 1st, 2001, for Ms. Edna Hubbard's accounts to be frozen; is that correct?

A: I think there was an order pertaining to that. I believe that was -- I don't know if I had been appointed at that time.

     \*       \*       \*       \*       \*       \*       \*

Q: This order was regarding Ms. Edna Hubbard's accounts?

A: Right. After I subpoenaed the bank records when I first learned about it, I saw that monies had been -- it was just sort of suspect, so I had some concerns. So I made my representations to the Court and what they did was freeze all the bank accounts and any credit cards until further investigation could be done.

     \*       \*       \*       \*       \*       \*       \*

Q:  And on those days, that was when the additional orders were entered by the Court directing Mr. Hasson to turn over certain account information regarding use of Ms. Edna Hubbard's property?

A:  Actually the May 14th one was an order where . . . he was to cease from obtaining credit cards in her name and turn over her vehicle and to remove his name from her deed in her annuity.

This testimony was offered to prove, and did prove, the contents of the orders.  Thus, I would hold that the trial judge erred in overruling the objection.

A review of the record establishes, however, that the error was harmless.  "In a criminal case, it is implicit that, in order to determine whether there has been 'a fair trial on the merits' and whether 'substantial justice has been reached,' a reviewing court must decide whether the alleged error substantially influenced the jury.  If it did not, the error is harmless."  Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001).  To implement this analysis, the Supreme Court has adopted the following test for non-constitutional harmless error:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . .  But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . .  If so, or if one is left in grave doubt, the conviction cannot stand."

Id. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

Hasson argues on brief that the evidence was "highly prejudicial" as to all the charges because it "strongly suggested malfeasance [by Hasson] to the extent that the court intervention was required against him even before the acts for which he was then on trial."  I believe the circumstances of these charges suggest the error only had slight effect on the jury.

Hasson acknowledges that this evidence was "at best only tangentially related to the charges for which [he] was on trial." Indeed, he was not charged with theft of Hubbard's card. The credit card theft charge was related to his use of Joan Renner's credit card number. All of the indictments concerning Hubbard or her property were for crimes Hasson committed after Hubbard's death. At that time, Hasson had no colorable claim that he was authorized to use Hubbard's credit card. His fraudulent uses of the credit card then were only marginally related to the protective order. I concur, therefore, in affirming the seven convictions related to Hasson's use of the credit cards (i.e., attempted false pretenses, attempted credit card fraud, credit card theft, and four counts of credit card forgery).

II.

I would also hold that the trial judge erred in permitting a police officer to testify about a novel scientific technique his colleague developed for lifting an image of a fingerprint from adhesives. Our Supreme Court requires an inquiry into the question of reliability when a party offers scientific evidence.

> When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis, Avent v. Commonwealth, 209 Va. 474, 478, 164 S.E.2d 655, 658 (1968); or unless it is so unreliable that the considerations requiring its exclusion have ripened into rules of law, such as "lie-detector" tests, Robinson v. Commonwealth, 231 Va. 142, 156, 341 S.E.2d 159, 167 (1986); or unless its admission is regulated by statute, such as blood-alcohol test results, Code §§ 18.2-268(O), -268(Y).

Spencer v. Commonwealth (Spencer II), 240 Va. 78, 97, 393 S.E.2d 609, 621 (1990).[4] In Avent, the Court relied upon a federal case to support the finding that, "'[f]ingerprint *identification* has

---

[4] The use of Spencer I and Spencer II as short forms of citations is limited to this opinion and not to be confused with citations used in other cases.

- 15 -

long been recognized by the courts as [an] entirely appropriate [scientific method].'" Avent, 209 Va. at 478, 164 S.E.2d at 658 (emphasis added) (quoting Stevenson v. United States, 380 F.2d 590, 592 (D.C. Cir. 1967)).

Fingerprint evidence is frequently used to establish identity or prove that an individual touched a particular surface. David A. Stoney, Fingerprint Evidence: Scientific Status, in 4 Modern Scientific Evidence: The Law and Science of Expert Testimony § 34:21, at 247 (David L. Faigman et al. eds., 2005). Through a process called fingerprint development, chemicals or powders are used to make latent fingerprints visible. Id. After latent fingerprints have been developed, the prints are recorded and then analyzed for identification. Id. "The issue is not the finding of two fingerprints that are alike, but rather the finding of prints from two different fingers that can be mistakenly be judged to be alike." Id. § 34:47, at 265-66. Here, the Commonwealth sought to establish that Hasson altered the vehicle identification number on the Jeep by introducing a latent fingerprint developed through a novel, experimental method. Thus, the scientific evidence offered in this case did not concern fingerprint analysis and identification, but instead related to an experimental means of latent fingerprint development as a means of accurately exposing the print.

A police officer, who had been a patrol officer for sixteen years and "a crime scene analyst" for one year, testified that the plate containing the vehicle identification number was removed from the interior of the Jeep Hasson possessed. When he examined the back of the plate, he found "a thin layer of foam adhesive." Over objection, the trial judge permitted the officer to testify that he lifted a fingerprint from that adhesive using a technique developed by another police officer in the department. He explained the process as follows:

> The back of this VIN plate is -- there's a very thin layer of foam, foamy type adhesive, which allows it to stick to a surface. Simply spreading black powder on this would be ineffective because it would stick to the entire surface.

> A colleague of mine, through research, developed a technique by which water, black powder and clear soap, dish soap, is mixed together in equal portions. And this is then spread on the surface of -- in this case, this adhesive. It could work on most any sticky surface, duct tape, electrician's tape and that sort of thing.
>
> The mixture then is rinsed off gently. And if there is any ridge detail on the sticky surface, the powder will stick to that while rinsing off the surface where there are no prints present.

He testified that the process exposes "ridge details of prints that are visible." When those "ridge details" are photographed, the photographs are then compared to a fingerprint database.

The development process employed by the officer was not shown to be either valid or reliable. These foundational omissions invalidate the process. Thus, it can hardly be said that the technique represented a scientific method "so familiar and accepted as to require no foundation to establish the fundamental reliability of the system." Spencer II, 240 Va. at 97, 393 S.E.2d at 621 (citation omitted).

The Supreme Court of Virginia has specifically held that "[t]he 'Frye test' has generated considerable criticism" and has declined to adopt it. O'Dell v. Commonwealth, 234 Va. 672, 696, 364 S.E.2d 491, 504 (1988). Though the Court has not described in detail the inquiries to be made or factors to be considered when testing whether the reliability of the scientific method has been established, it has alluded to them. For example, in Spencer v. Commonwealth (Spencer I), 238 Va. 275, 384 S.E.2d 775 (1989), the Court observed that the witnesses who were experts in their fields testified the technique at issue was reliable, that false positive results were eliminated by using a sufficient number of probes, that the testing was conducted in a reliable manner, that the technique is generally accepted, and that the technique is used in thousands of laboratories. Id. at 289, 384 S.E.2d at 782-83.

While it is true that our Supreme Court has not adopted all the features of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), as the controlling test in Virginia, the

- 17 -

Court has noted that "[p]rior to Daubert, . . . [it] discussed the trial court's role in making a threshold finding of scientific reliability when unfamiliar scientific evidence is offered." John v. Im, 263 Va. 315, 322 n.3, 559 S.E.2d 694, 698 n.3 (2002) (citations omitted). Thus, while not dispositive as a test in Virginia, the Daubert discussion concerning the factors that comprise an analysis of scientific reliability certainly is instructive. They are:

> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green 645. See also C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability") (emphasis deleted).

> Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, The Fifth Branch: Science Advisors as Policymakers 61-76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical Basis of Peer Review and the Suppression of Innovation, 263 JAMA 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Ziman, Reliable Knowledge: An Exploration of the Grounds for Belief in Science 130-133 (1978); Relman & Angell, How Good is Peer Review?, 321 New Eng. J. Med. 827 (1989). The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

> Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, see e.g., United States v. Smith, 869 F.2d 348, 353-354

(CA7 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation, see United States v. Williams, 583 F.2d 1194, 1198 (CA2 1978) (noting professional organization's standard governing spectrographic analysis), cert. denied, 439 U.S. 1117 (1979).

Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." United States v. Downing, 753 F.2d, at 1238. See also 3 Weinstein & Berger ¶ 702[03], pp. 702-41 to 702-42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique which has been able to attract only minimal support within the community," Downing, 753 F.2d at 1238, may properly be viewed with skepticism.

Daubert, 509 U.S. at 593-94.

Indeed, these factors arguably are merely an expansive discussion of the factors considered in Spencer I, 238 Va. at 289, 384 S.E.2d at 782-83. As exemplified by Spencer I, these factors manifest a concern, not limited to federal jurisprudence, that the principles and methodology which underlie a proffered technique be based upon "a reliable scientific technique." 238 Va. at 289, 384 S.E.2d at 782.

In this case, the Commonwealth failed to establish that the police officer's method was a "reliable scientific technique." Id. On further voir dire examination, the officer testified:

[My colleague,] through various experimentation, came up with this formula or this mixture, which she found very effective in her experiments.

I tried it on an experimentational basis myself with duct tape and other sticky sides and met with success. And that's the process I used on this.

Q: Did you use -- has that technique been used -- that technique of analysis been admitted into evidence in previous cases that you're aware of or any you have been involved in?

- 19 -

A:  None that I've been involved in and I'm not aware of others if there have or not.

Q:  Even though it was similar, are you aware of any periodicals or publications that would say that that is a valid type of material to use to take fingerprints with?

A:  No official documentation that I've seen.

Q:  Were you able to -- when you said you did it on various surfaces to try to see the results, were you able to do that particular mixture of whatever it was with the more commercial ones or ones that had been used in the past to see if there was any difference in the results?

A:  No.

Q:  Based on this solution?

A:  Correct.  No.

The officer testified that his training in this area has been "[j]ust through experience and work and the experimentation that [he has been] referring to."

The officer's testimony failed to establish reliability of the technique or to provide a basis to support a finding that the technique he used was either scientifically reliable or valid.  Spencer II, 240 Va. at 97, 393 S.E.2d at 621.  As he indicated, the technique was developed by one of his colleagues through experimentation.  This testimony merely described random anecdotal observations without reference to any recognized system or theory.  The officer testified that the mixture he used on the adhesive produced results when he conducted an experiment with duct tape.  He testified that he was not aware of any documentation or use by other persons concerning this mixture or technique.  In short, this testimony did nothing to establish refutability, falsity, error rates, or validity.  These qualities implicate the reliability determination.

The majority looks to the California Supreme Court opinion in People v. Webb, 862 P.2d 779 (Cal. 1993), to support their decision that the novel development technique employed by the

- 20 -

police officer in this case was properly admitted. In Webb, the California Supreme Court ruled that "[t]he reliability of the laser procedure in producing an image commonly recognizable only as a human fingerprint was manifest at trial . . . [and] was seen by the jury." 862 P.2d at 798. This ruling does not support a conclusion that the technique used in this case was reliable, and it does not satisfy the Spencer II standard that the trial judge "must make a threshold finding of fact with respect to the reliability of the scientific method offered." 240 Va. at 97, 393 S.E.2d at 621. Simply put, it is not unreasonable to require that Virginia's evidentiary standards for admissibility be satisfied in this case.

"Expert testimony founded upon assumptions that have no basis in fact is not merely subject to refutation by cross-examination or by counter-experts; it is inadmissible." Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005) (citations omitted). Likewise, expert testimony that demonstrates the "expert has not considered all variables bearing on the inferences to be drawn from the facts presented" is inadmissible. Forbes v. Rapp, 269 Va. 374, 381, 611 S.E.2d 592, 596 (2005). The trial judge has no discretion to admit unreliable evidence and leave to the jury the decision how much weight to accord it. Id. The trial judge's failure "to strike such testimony upon a motion timely made is error subject to reversal on appeal." Vasquez, 269 Va. at 160, 606 S.E.2d at 811. I would hold, therefore, that the officer's testimony concerning the technique he used to lift fingerprints from the adhesive surface was not based upon evidentiary proof that the technique was scientifically reliable and that the results he achieved were not proved to be valid. I would reverse the convictions for receiving stolen property (Code § 18.2-108) and for knowingly possessing a motor vehicle that had an altered identification number (Code § 46.2-1075), and I would remand for a new trial on those charges.

III.

For these reasons, I would affirm the convictions for credit card theft (Code § 18.2-192), attempting to obtain money by false pretenses (Code § 18.2-178), attempting to commit credit card fraud (Code § 18.2-195), and four counts of credit card forgery (Code § 18.2-193).[5] I would reverse the other two convictions and remand for a new trial.

---

[5] Hasson's sentencing order contains an error. The jury convicted Hasson of four counts of credit card forgery in violation of Code § 18.2-193 and of other offenses. The final sentencing order lists four convictions for credit card forgery but indicates that one of those convictions (CR56890) is for violation of Code § 18.2-192, which pertains to credit card theft. I would remand this order for correction.